THE UNITED STATES MORTGAGE COMPANY

*v.*

J. GROSS *et al.*

1. CORPORATIONS—*may take mortgages to secure payment of debts.* The general incorporation act of 1872 was not designed to prevent corporations, domestic or foreign, from taking mortgages on real estate as security for the payment of debts due them. If mortgaged premises are sold under powers in such mortgages, the mortgagees can not themselves become purchasers; but if the mortgages are foreclosed by suit, the decree of the court then becomes the basis of· title. The act contemplates that such corporations will acquire real estate in satisfaction of indebtedness due them, but makes provision for its sale so as to prevent perpetuities.

2. SAME—*power to loan money under act of* 1872. It is the policy of the general incorporation law of 1872 that corporations shall not be formed in this State for the business of loaning money, and foreign corporations are denied the exercise of any powers in this State which are prohibited to domestic corporations. Therefore, a loan of money by a foreign corporation, secured by a mortgage on real estate in this State, was by that act rendered invalid.

93 483
78a 243
93 483
181 78
93 483
f184 261
93 483
186 520
186 525
93 483
202 162
j202 175
93 483
208 5242
208 8245

3. SAME—*effect of act of* 1875 *as validating loans of money.* It was the evident intention of the act of April 9, 1875, in relation to foreign corporations, to give them power to invest or loan money in this State, and to validate contracts of loans previously made by them in this State, and make them enforcible the same as if they had not been prohibited when made.

4. STATUTE—*whether prospective or retroactive.* A statute must have a prospective operation only, unless its terms clearly show a legislative intention that it shall operate retrospectively.

5. CONSTITUTIONAL LAW—*power to pass retrospective laws.* Unless there is a constitutional inhibition, a legislature has the power, when it interferes with no vested rights, to enact retrospective statutes to validate invalid contracts, or to ratify and confirm any act it might lawfully have authorized in the first instance.

6. Where an act of the legislature goes no further than to bind a party by a contract which he has attempted to enter into, but which was invalid by reason of some personal inability on his part to make it, or through neglect of some legal formality, or in consequence of some ingredient in the contract forbidden by law, it is only a question of policy, and not one of constitutional power.

7. SAME—*validating contract as against purchaser.* Where a third party purchases under such a state of facts as precludes his acquiring an equitable as well as a legal title, the legislature may confirm and validate the original contract made by his vendor or assignor so as to divest him.

8. Where A procured a loan of money from a foreign corporation, which loan was prohibited by the statute then in force, and gave his note, secured by mortgage on real estate, to secure its repayment, with interest, and afterwards sold the same real estate to B, subject to the mortgage, who expressly assumed the payment of the debt as a part of the price to be paid, and gave back a note and mortgage to A for the balance of the purchase money, and A indorsed and pledged the note for money loaned him, and the same was sold to C before its maturity, and after which the legislature passed an act retrospective in its operation, making valid such loans by foreign corporations, it was *held,* that, as to the security for the note, C took only an equitable title, and being chargeable with notice of the assumption of the original indebtedness by B, under whose mortgage he claimed, the act validating the original contract and mortgage was good, and binding on C as well as on the other parties.

9. ASSIGNMENT—*assignee takes security subject to equitable defences.* Where a party takes an assignment of a note secured by a deed of trust, and to enforce which he resorts to a court of equity, he will hold the security for the debt with all the equities and infirmities existing against it, and will have no stronger or better claims under it than his assignor could have claimed, though he acquires the note before its maturity.

10. SAME—*notice of equities by chain of title.* Where a party takes a trust deed as the assignee of the note secured by it, he will be chargeable with notice of all equities appearing in the chain of title whereby he acquires a lien under the trust deed. Thus, he will be bound by the recitals in the deed to the grantor in the deed of trust showing equities in a third person.

11. DEED—*construction.* The whole of a deed or mortgage must be construed together, and a reservation or waiver in favor of the grantor or mortgagor must be interpreted in the light of the other provisions of the deed; and if a deed is equally susceptible of two interpretations, that meaning will be adopted which is adverse to the interests of the grantor.

12. MORTGAGE—*waiver of benefits in, construed.* Where a mortgagor covenanted in a mortgage as to the title of the property, and to keep the security free from impairment, by the payment of taxes, assessments, etc., and, after the *habendum* clause, it was provided that if a strip of ground off one end of the premises should be taken for the extension of a street, any benefit which might accrue to the mortgagor might be paid by the city to him directly, instead of to the mortgagee, and the city assessed the compensation and damages for the strip condemned at $10,952.73, and, afterwards, the benefits to the remaining portion at $15,897.84, it was *held*, that the mortgagor or his grantee could not claim and recover the compensation assessed without paying off the assessment of benefits against the property, and that the words, "benefits that might accrue," had reference to any surplus of compensation over the benefits assessed as a charge upon the property.

APPEAL from the Superior Court of Cook county.

Benjamin Lombard, being the owner of lot 13 and the south half of lot 12, in block 139, School Section addition to the city of Chicago, on August 22, 1872, executed a mortgage thereon to the United States Mortgage Company, a corporation created by a law of the State of New York, and whose place of business was in the city of New York, to secure the payment, in gold coin, of $50,000, in five years, at nine per centum interest per annum, which was duly recorded. The mortgage contained a clause, inserted after the *habendum* and warranty clauses, as follows:

"It is understood and agreed that this mortgage is to be subject to the right of the city to take so much of said lots as shall be necessary for the opening of and extension of Dearborn street, being 36 feet, more or less, off the west end of said premises, in which event any benefit which may accrue

to the said party of the first part herein, may be paid by the city to the said party of the first part direct."

It was covenanted in and by this mortgage that the grantor should pay the interest semi-annually, in gold coin, and all interest, taxes, insurance and assessments; and if default should be made therein, then the whole debt was to become due in thirty days after October 1, 1873, and the mortgagee might then sell the property, on thirty days' notice, to pay the debt.

The loan was negotiated by Lombard to provide the necessary funds with which to erect a six-story and basement brick and stone building on the premises. Lombard proceeded in the erection of the building, covering the whole of the lots except the west thirty-five feet, which was not built upon, for the reason of the contemplated extension, by the city, of Dearborn street from Jackson street to Fourteenth street. The building was made with its main front on Dearborn street so to be extended and opened, and with a front also on Third avenue, which gave to the lots and buildings two fronts, one east on Third avenue and the other west on Dearborn street as proposed to be extended and opened.

Up to December 10, 1872, the walls of the building had been constructed, the roof put on, and the interior in part finished. On that day Lombard and wife sold and conveyed by warranty deed the whole of the premises with the building thereon, subject to this mortgage, to the National Life Insurance Company of Chicago, whereof Lombard was president and one of the principal stockholders, for the sum of $100,173, a part of which was in the assumption by the insurance company of this debt to the United States Mortgage Company, and as part of the purchase money the insurance company executed and delivered to Lombard their promissory note for $12,273, drawn to the order of that company and by the company indorsed in blank, payable three years after date with interest at ten per centum per annum, payable semi-annually, to secure the payment of which the insurance company, on the same

day, executed and delivered to Josiah L. Lombard, as trustee, a deed of trust containing full covenants of warranty on the whole of the premises, which deed was duly recorded. This note, so made and indorsed by the insurance company, was pledged by Benjamin Lombard, as collateral, on a loan of $4500 borrowed by him of a bank in Chicago. This collateral was subsequently sold by the bank to J. L. Lombard, for $3200, and said J. L. Lombard afterwards sold it to one J. Gross, to whom it was delivered with only the indorsement of the insurance company upon it, for $5000, for which he executed his note to J. L. Lombard, and the note for $12,273 was thus owned by Gross; and no part of it having been paid, there was due upon it for principal and interest $16,159.45, at the date of the decree herein.

On June 1, 1874, the said National Life Insurance Company was duly adjudged a bankrupt, and one Kirk Hawes appointed assignee. No dividend has ever been paid to the creditors of the company, and the estate will pay but a small per cent of its indebtedness. Prior to this, Benjamin Lombard was declared a bankrupt and no assets are known to exist out of which to satisfy his creditors.

On March 17, 1873, the common council of the city of Chicago, in pursuance of law, passed an ordinance for the opening and extension of Dearborn street as above stated, the costs and expenses of which were to be paid for by special assessments upon the property along the line of such street specially benefited thereby. On the petition of the city to the Superior Court of Cook county praying for the condemnation of this thirty-five feet and to ascertain the compensation to which the owner would be entitled for taking the same, a jury was called, who found as compensation $10,952.73, and upon this finding a judgment was rendered by said court, and the same is in full force and in no part paid or satisfied.

These damages or compensation having to be paid by benefits to contiguous property, a commission was subsequently appointed by the Superior Court, on petition therefor, who

adjudged the benefits to the remaining portion of these lots, by reason of this improvement, to be the sum of $15,897.84, and no appeal or writ of error was ever taken. No proceedings have been taken by the city to enforce these assessments, nor has it taken possession of any part of the premises on which to construct the street.

The National Life Insurance Company having become possessed of the legal title to these premises by the deed of Lombard and wife, Kirk Hawes, the assignee in bankruptcy of that company, exhibited his bill on the equity side of the Superior Court of Cook county, for the purpose of having the validity and priority of the liens on the premises adjudicated by a decree of court, and suits therefor consolidated, those of the mechanics and material-men being then pending, and the lots and building thereon sold, and the proceeds distributed and paid to those who might be found to be entitled thereto by decree of the court.

To this bill J. Gross was made a defendant, as also the United States Mortgage Company. Gross also filed a cross-bill, the object of which was to establish in himself a valid and first lien upon the premises under the trust deed and note executed by the National Life Insurance Company as above stated, and for the further purpose of having the mortgage of Benjamin Lombard to the United States Mortgage Company, under which that company claims a first lien, declared null and void, on the ground that said company is, and was at the time the mortgage was executed, a foreign corporation, organized under a law of the State of New York, and having its place of business there, and having no legal existence in this State, and could not take the title by mortgage or otherwise nor acquire any interest therein or valid title thereto.

To this cross-bill the United States Mortgage Company filed an answer, and also answered the bill of Hawes, setting out all the facts as above stated, and that $70,000 was due it for principal, interest, taxes, etc., and alleging default on the part of Lombard in paying interest, taxes, etc., and claiming

the right to sell the property to pay the debt as stipulated in the mortgage, and claiming that in equity the damages awarded for taking the thirty-five feet ought to be set off, so far as they go, against the benefits. And they allege that Lombard and the National Life Insurance Company were insolvent when default was made in payment of interest due the mortgage company and when assessments of damages and benefits were made, and still are insolvent and their estates worth nothing.

The mechanics and material-men also filed answers and cross-bills claiming liens, and it was agreed that proper pleadings were filed by the several parties, whereby were properly put in issue the questions presented by the above facts.

A hearing was had on the bill of Hawes, cross-bills, answers, replications, and testimony taken in court, and it was ordered, adjudged and decreed that the United States Mortgage Company had the power to take the mortgage in question, and found that the mortgaged premises were not worth the amount due on said mortgage, together with the special assessments thereon, but decreed that said company, by the clause above recited in the mortgage, waived any benefit which might result to Benjamin Lombard, his grantees or assigns, and to any damages which might be adjudged against the city for taking the thirty-five feet of said premises. That by the subsequent conveyance of this property to the National Life Insurance Company, and the execution of the trust deed to Josiah L. Lombard by that company, to secure the note of $12,273, Gross, as the legal and equitable holder thereof, had a valid and first lien upon this thirty-five feet, and was entitled to all the proceeds arising out of the condemning the same, and entitled to the whole of the judgment against the city of Chicago for $10,952.73 and interest due thereon, and that the same should be paid to Gross.

The decree also found the liens of the mechanics and material-men valid and effectual. It further found that the lien created by the deed of trust of the National Life Insurance

Company to Josiah L. Lombard was inferior to and subject to the lien of the United States Mortgage Company and to the several mechanics' liens as to the whole of the lots, except these thirty-five feet condemned for Dearborn street. That the lien of the United States Mortgage Company was prior and paramount to the several mechanics' liens to the extent of the value of the land at the time when the contract between Leach, who built the walls, and Benjamin Lombard was made, to-wit, September 11, 1872, and, to that extent, is to be preferred in the division of the proceeds arising from the sale of the premises.

There were other items of the decree not necessary to be noticed, as no point is made upon them.

The United States Mortgage Company excepted to this decree and bring the record here by appeal, and assign these errors:

1. The court below erred in deciding that appellant had waived its mortgage lien on the west thirty-five feet of the lots mortgaged to it, regardless of the keeping of the covenants made by the mortgagor with appellant.

2. Also, in deciding that the appellee, J. Gross, was entitled to receive from the city of Chicago the amount awarded as compensation, or damages, for taking the west thirty-five feet of the said lots for a street, and regardless of the payment of the debt then due appellant and of the covenants of the mortgagor with appellant.

3. Also, in deciding that said J. Gross, appellee, was entitled to have received such award of damages, irrespective of the payments of the assessment of benefits made to pay such award.

4. Also, in deciding that said J. Gross was entitled to receive the full face of the note held by him, and the full amount of the awarded damages, even if entitled to recover anything.

Cross-errors are also assigned by Gross, complainant in the cross-bill, as follows:

1.   The court erred in finding the mortgage of said United States Mortgage Company valid and giving it a lien on any part of said premises.

2.   The court erred in making the mortgage of said mortgage company a prior lien upon that part of said premises not taken for a street to the lien of said Gross.

3.   The court erred in finding that said L. L. Leach had a mechanic's lien on the premises in controversy in this suit, or on any part thereof, and allowing the claim of said Leach and decreeing its payment.

4.   The court erred in finding that said Hall & Winch had a mechanic's lien on said premises, or any part thereof, and in allowing the claim of said Hall & Winch, and in decreeing its payment.

5.   The court erred in finding that said A. W. Wheeler had a mechanic's lien on said premises, or any part thereof, and in allowing the claim of said Wheeler and decreeing its payment.

6.   The court erred in not finding the trust deed, given to secure the payment of the note held by said Gross, a valid first lien upon the whole of said premises, and in not decreeing that the whole amount due said Gross on said note should be paid out of the proceeds of the sale of said premises, before any of the other claimants in this suit.

Messrs. WALKER, DEXTER & SMITH, for the appellant.

Mr. W. C. GOUDY, and Mr. THOMAS S. MCCLELLAND, for the appellees.

Mr. JUSTICE BAKER* delivered the opinion of the Court:

We will first examine as to the validity of the mortgage executed by Lombard to the United States Mortgage Company.

---

* This cause was decided and the opinion prepared during the time Mr. JUSTICE BAKER was on the Bench.

The charter of that company is not incorporated in the record, but from its name, the character of its transaction here involved, and the facts appearing in the case, we may reasonably conclude its principal or sole business was and is to loan money, taking to itself mortgages on real estate to secure the same.

The general incorporation law of 1872, which was in force when the mortgage was executed, provided for the formation in the State of companies for any lawful purpose, expressly excepting, however, corporations for banking, insurance, real estate brokerage, operation of railroads, and the business of loaning money. Section 26 of the act provided that "foreign corporations, and the officers and agents thereof, doing business in this State, shall be subjected to all the liabilities, restrictions and duties that are or may be imposed upon corporations of like character organized under the general laws of this State, and shall have no other or greater powers. And no foreign or domestic corporation, established or maintained in any way for the pecuniary profits of its stockholders or members, shall purchase or hold real estate in this State, except as provided for in this act."

From these statutory enactments we deduce these conclusions: The latter sentence of section 26 was aimed at the purchasing and holding of real estate by corporations, for the reason such acts would tend to create perpetuities; and by this and other provisions of the same act the evil feared was effectually guarded against. We think, however, it was not designed thereby to prevent corporations from taking mortgages on real estate as security for debts. In fact, the act contemplates corporations will acquire real estate in satisfaction of indebtedness due them, and makes such provision in the fifth section for the sale of real estate so taken as secures the State against the evil had in legislative view and which had been discussed by this court in *Carroll* v. *The City of East St. Louis*, 67 Ill. 568. Indeed, it is difficult to see how mortgages, which are conveyances subject to conditions of

defeasance, can be considered as tending to create perpetuities. Payments made of the debts thus secured defeat the titles of the mortgagees, and even if they take possession the incomes gradually undermine and destroy their titles. If the premises are sold under powers, the mortgagees can not themselves become purchasers; and if the mortgages are foreclosed by suit, the decrees of the court thereafter become the bases of title.

But, we see, from the first sentence of this section 26, it was the policy of the State that foreign corporations should have no other or greater powers in the State than corporations of like character organized under the general laws of the State; and further see, from the first section of the act it was a part of that same policy that corporations should not be formed in the State for the business of loaning money. It follows that corporations organized in a foreign State for such business of loaning money could not claim to pursue such business in this State. The comity between the States does not demand we should hold this mortgage company, incorporated under an act of the State of New York, could lawfully, within this State, exercise powers denied to corporations formed within our own borders. All the acts of this company here done in furtherance of such business of loaning money were invalid as being obnoxious to our policy and institutions.

The act of April 9, 1875, provides, among other things, that any corporation formed under the laws of any other State or country, and authorized by its charter to invest or loan money, may invest or loan money in this State. And any such corporation that may have invested or lent money as aforesaid, may have the same rights and powers for the recovery thereof, subject to the same penalties for usury, as private persons, citizens of this State; and when a sale is made under any judgment, decree, or power in a mortgage or deed, such corporation may purchase, in its corporate name, the property offered for sale, and become vested with the title

wherever a natural person might so do in like cases. Laws 1875, p. 65.

It was the evident intention of this latter act, not only to change somewhat the policy of the State, but to validate such contracts as that here under consideration. It is urged by appellant, that even if the mortgage was theretofore invalid, it was rendered valid and binding by this act; and by appellee it is contended the act thus construed would deprive him of his property without due process of law, and take from him a vested right.

A statute must have a prospective operation only, unless its terms show clearly a legislative intention that it should operate retrospectively. Here, there is no doubt, the statute is retroactive; it is expressly so on its face. Unless there be a constitutional inhibition, a legislature has power, when it interferes with no vested right, to enact retrospective statutes to validate invalid contracts or to ratify and confirm any act it might lawfully have authorized in the first instance. We do not deem it necessary to cite any of the many cases where this doctrine has been announced or followed. In Cooley's Constitutional Limitations, p. 374, it is said: "When such acts go no further than to bind a party by a contract which he has attempted to enter into, but which was invalid by reason of some personal inability on his part to make it, or through neglect of some legal formality, or in consequence of some ingredient in the contract forbidden by law, the question they suggest is one of policy and not one of constitutional power."

Lombard borrowed the money and attempted to make a valid contract of mortgage to secure its payment, and he was, if not legally, at least in justice and good conscience, bound thereby; and it is clear the mortgage might well be validated so far as regards him. But it is claimed the rights of third persons have intervened which can not be affected by this legislation. The true line of distinction is laid down by Cooley in his work on Constitutional Limitations, just quoted

from. On pages 378 and 379, he says: "The operation of these cases, however, must be carefully restricted to the parties to the original contract and to such other persons as may have succeeded to their rights with no greater equities. A subsequent *bona fide* purchaser can not be deprived of the property which he has acquired, by an act which retrospectively deprives his grantor of the title which he had when the purchase was made. Conceding that the invalid deed may be made good as between the parties, yet if, while it remained invalid, and the grantor still retained the legal title to the land, a third person has purchased and received a conveyance, with no notice of any fact which should preclude his acquiring an equitable as well as a legal title thereby, it would not be in the power of the legislature to so confirm the original deed as to divest him of the title he has acquired. The position of the case is altogether changed by this purchase. The legal title is no longer separated from equities, but in the hands of the second purchaser is united with an equity as strong as that which exists in favor of him who purchased first. Under such circumstances even the courts of equity must recognize the right of the second purchaser as best, and as entitled to the usual protection which the law accords to vested interests."

We understand the rule to be that where a third party purchases under such state of facts as would preclude his acquiring an equitable as well as a legal title, the legislature may confirm the original contract so as to divest him. So, here, the National Life Insurance Company had and has no equity as against the United States Mortgage Company, and bought expressly subject to its equity, and agreed, as a part of the purchase money for the premises, to pay the debt which was, in equity and good morals, due from Lombard to the mortgage company. It would be inequitable and unjust to permit the insurance company, were it here defending against this mortgage, it having agreed to pay $100,173 for these lots, the larger portion of which was in the assumption of the debt of

Lombard to the mortgage company, and secured or attempted to be secured by the mortgage expressly subject to which it purchased, to now hold this valuable property discharged of this debt. It received full consideration for this assumption of the mortgage debt, and to now keep and possess the property released therefrom would be such want of good faith on its part, both towards Lombard, its grantor, whose debt it was paid for assuming, and to appellant, as a court of equity would be loth to sanction. We think it evident the insurance company took the lots with no greater equities than existed in Lombard, the party to the original mortgage contract with appellant.

Great stress is laid by appellee upon the case of *Thompson* v. *Morgan*, 6 Minn. 295, and it is said that case is exactly like the one at bar. We do not think the cases are analogous. Even if we assume the doctrine of that case to be correct, a point it is not deemed necessary to here examine, yet there is a broad and fundamental distinction between the two cases. In that case the court held the mortgage from Folsom to Morgan was ineffectual to pass an interest in the land, because not executed in conformity with statutory requirements, and that although Folsom afterwards conveyed the premises to Babcock subject to the Morgan mortgage, and so expressed in the deed, yet he could safely take the title subject to the mortgage, and rely upon the defence that was patent upon its face for protection, and that the curative act of July 26, 1858, could have no effect to validate the Morgan mortgage to the prejudice of Babcock, or of Thompson, who claimed under him. But, it will be noted, the *gist* of the case is the *mere* notice to Babcock, and the question was whether such *notice* changed his *status* as regarded the character and defects of the mortgage. And the court said: "Babcock might perhaps have estopped himself from questioning the validity of this mortgage, by an appropriate clause in his deed recognizing it as a subsisting lien and waiving its defects, but the mere admission of notice that such a mortgage existed, by a

recital of it in this deed, through which he derived his title, would not operate such a consequence." We regard this as a plain intimation, by the Supreme Court of Minnesota, that had this element of a recognition of the mortgage as a lien and waiver of defects appeared in the record, the decision of that case would have been otherwise. In the case at bar the premises were not only sold subject to the mortgage, but there was an express assumption of the mortgage debt, and a promise to pay that mortgage debt as a part of the consideration of the purchase. The facts of this case go far beyond a mere notice, and beyond even that which seems to have been deemed sufficient in *Thompson* v. *Morgan.*

Although Gross took the note of the National Life Insurance Company, secured by the second mortgage, before maturity, yet, as regards the mortgage or trust deed security, he merely stepped into the shoes of Lombard and the insurance company. He has but an equitable title to the trust deed, to enforce which he has resorted to a court of equity, and he holds such title with all the equities and infirmities existing against it, and has no stronger or better claims under it than his assignor could have claimed. *Darst* v. *Gale,* 83 Ill. 137; *Walker* v. *Dement,* 42 id. 272; *Fortier* v. *Darst,* 31 id. 212. So far as the security for the note is involved Gross took with notice, he claiming his lien under and through the insurance company and Lombard, and is affected by the recitals and covenants in the deed from Lombard to the insurance company to the same extent they were. When he took the trust deed as a security he was chargeable with notice of all equities appearing in the chain of title whereby he acquired a lien under that trust deed, and the equity of the United States Mortgage Company appeared in the deed to the grantor in the trust deed under which he claims. So, the same knowledge imputable to Lombard and the insurance company is imputable to him, when he stands in the court of equity seeking relief, not as the legal holder of negotiable paper assigned before maturity, but in the attitude, so far as con-

cerns the equitable security, of an assignee of an equitable title, subject to all the equities and infirmities existing against it in the hands of the original parties to the contract.

Our conclusion is, it was entirely competent for the General Assembly to validate the mortgage in question, not only as to the parties to the original contract, but as to Gross, the assignee of the equitable interest in the trust deed, since, under the circumstances of the case, he has no such equities as will give him a vested right as against the equities of the mortgage company. A party can not have a vested right contrary to equity and justice.

The other principal question at issue is, who is entitled to the judgment for $10,952.73 against the city? Should that judgment be paid to Gross, the holder of the note secured by the trust deed executed on the premises and delivered to Lombard, in whose favor the waiver clause in the mortgage to appellant was made? Or, should it be paid to appellant, who holds the first mortgage but took the same with that waiver clause in it?

We think it a misapprehension to say the thirty-five feet of ground, the appropriation of which to the opening and extension of Dearborn street was contemplated, was either omitted or released from the mortgage. The premises purporting to be conveyed by way of mortgage were the entire premises, the whole lot and the half lot, and then, after the description of the lots mortgaged and after the *habendum* clause, was inserted a provision that if the strip of ground off the west end of the premises should be taken by the city for the purposes of the extension, then, in that event, "any benefit which may accrue to the said party of the first part herein, may be paid by the city to the said party of the first part direct."

What was the intention of the parties to the contract? The whole instrument must be construed together, and this stipulation must be interpreted in the light of the other provisions of the deed. And if the deed is equally susceptible of two

interpretations, it is a well established rule that meaning will be adopted which is adverse to the interests of the grantor. *City of Alton* v. *Illinois Transportation Co.* 12 Ill. 38.

Lombard was the general owner of the lots, and for the purpose of securing funds with which to build thereon he borrowed $50,000 from appellant, and mortgaged the premises. He covenanted to pay the debt and interest, and that the real estate was clear of all incumbrances, and that he would warrant and defend the same, and suffer no impairment of the security of the mortgage company, and that the mortgage should stand as security for any money paid for taxes or insurance, and that on failure to pay any taxes or assessments on said lots, or keep any other covenants, the whole of the debt should become due at the option of the mortgage company.

It is clear, from this, it was intended Lombard should pay the benefits assessed against the lots for the proposed improvement, since it was expressly stipulated he should suffer no impairment of the security, and that on his failure to pay any assessment on the premises, the whole debt might be declared due. It was evidently contemplated Lombard would continue to hold the lots and building to be erected thereon, and intended the investment of appellant, which was for a term of years, should be kept secure, and that the interest on the loan, and taxes, insurance and assessments on the property, should be paid by Lombard. It is also plain, from the mortgage itself, as well as from the manner in which the building was constructed, with its main front on Dearborn street as proposed to be extended, and leaving the thirty-five feet unoccupied, it was considered that street would shortly be opened. If this was done, there would necessarily be benefits assessed against the lots, and, on the other hand, compensation allowed the lot owner.

Lombard was already, by his covenants, bound to pay the assessments levied for benefits, and to suffer no impairment of the security held by the company—and this, too, under a heavy penalty, which, if imposed, would be likely to deprive

500     U. S. MORTGAGE CO. *v.* GROSS *et al.*     [Sept. T.

Opinion of the Court.

him of the whole of this valuable property. In that state of the case, it was stipulated the benefit which might accrue should be paid to Lombard direct. The several parts of the instrument should be construed together, and thus construing them, we think it manifest it was the understanding Lombard should collect the compensation, and, at the same time, pay the assessments, so as to keep the security unimpaired.

The phraseology of the stipulation relied on by Gross is peculiar. After the recitation in reference to the anticipated extension of Dearborn street, the language used is, "in which event, any benefit which may accrue to the said party of the first part herein may be paid by the city to the said party of the first part direct." It is plain the word *benefit* is not used in the technical sense in which that word is used in the statute. The words, "compensation and damages," are the words there used to indicate the amounts to be paid to the lot owner by the city; and the word "benefit" is the word used in the law to indicate the amount to be paid by the lot owner to the city. The stipulation is not that the compensation or damages should be paid by the city to Lombard direct. Now, as we have seen, Lombard was bound by his covenants to pay the assessments for benefits and suffer no impairment of the security, and he is entitled by the same contract to "any benefit which may accrue to him," he being the general owner. The prospective compensation that would become due from the city, without special provision otherwise, would be payable to the mortgage company by virtue of the lien on the property taken, and would be a credit upon the loan. This was, therefore, provided against, and, as it was at least possible, if not probable, the improvement would result in an excess of compensation over the assessment made on the lots, it was stipulated any benefit which might accrue should be paid to Lombard direct. In other words, if the compensation exceeded the assessment, then a pecuniary "benefit" would accrue to the lot owner from the opening of the street, and that, instead of being credited on the debt, was to go to the owner of the lot; but

if, as the event was, the assessment exceeded the compensation for the thirty-five feet taken, then no pecuniary "benefit" would accrue to the lot owner from the extension of the street.

It would seem this was the real meaning and understanding of the parties to the contract, and the real object in view in inserting the waiver clause. Lombard would thereby not only pay the assessment, but collect the compensation, and get the benefit of any surplus of compensation and damages over benefits—the United States Mortgage Company being only interested that the opening of the street would impose no additional burden upon them and not impair the security they held. We think a consideration of the whole contract and all its various provisions, in the light of the surrounding facts and circumstances, clearly shows this was the real substance of the arrangement between the parties.

It appears the compensation awarded for the portions of the lots taken for the street was $10,952.73, and that the benefits assessed against the remaining portions of the lots were $15,897.84. So that, if Lombard had in good faith performed his contract made with the appellant company, not only would the whole of the compensation have been absorbed in paying the assessment, but he would have been obliged to pay $4945.11 in addition thereto. The rules of equity do not require he should be allowed a premium for his breach of contract. If Lombard himself were here in a court of equity, claiming this fund of $10,952.73, and at the same time admitting his failure to pay either debt, interest, insurance, taxes, or even the assessment of benefits growing out of the self-same improvement from which that fund originated, and casting back upon appellant the mortgaged property thus incumbered and the security thus impaired, his claim would only be enforced by setting it off against the above mentioned just demands against him. It also appears from the record he is insolvent and a bankrupt, and that no assets of his are known to exist, and that the National Life Insurance Com-

pany is in like predicament, and that the mortgaged premises are not worth the amount due on the mortgage and the special assessments on the lots. These latter facts but intensify the case, to show the rank injustice that would be done in giving this fund to either Lombard or the insurance company, were either he or it here asking therefor.

But it is claimed this view overlooks the rights and position of Gross. That position and those rights we have considered in connection with the other branch of the case. We have seen that, as regards the trust deed, he bought that which was not assignable at law, and with notice of the equities of the mortgage company, and took that security subject to all the infirmities to which it would have been liable in the hands of Lombard or the insurance company. When recourse is had to a court of chancery, such assignment will not cut off prior and stronger equities against the same fund.

It is also claimed the damages arising from the taking of these thirty-five feet of the lots by the city can not be set off against the benefits assessed against the remaining part of the lots, and the decision of this court in *Carpenter* v. *Jennings et al.* 77 Ill. 250, is referred to in that connection. The question there considered was as to the constitutional powers of commissioners of highways in laying out a public road, while this case involves no such inquiry, but the validity and construction of a contract, and the equities of appellant and appellees, respectively.

The adjudication of the claims of the mechanics and material-men was right.

The decree must be reversed on the assignments of error made by the United States Mortgage Company, and the cause is remanded for further proceedings consistent with this opinion.                                    *Decree reversed.*

Mr. CHIEF JUSTICE WALKER, dissenting:

I am unable to concur in the conclusion of the majority of the court in this case. Even if the General Assembly has the

constitutional power to validate this void contract, which I will not now consider, I hold that it had no power to make it a binding contract as to Gross, who could not know that the General Assembly would render the void contract binding when he purchased. He may be liable, in equity, to his grantor for so much of the mortgage held by appellant which he agreed to pay as a part of the consideration of the purchase, but I hold the General Assembly had no power to require him to pay the void mortgage held by the mortgage company which was void, and being so, was no lien on the property. The General Assembly, I think, had no power to create a lien by declaring it valid.