# PEMBROKE, Appellant, v. HUSTON.

### Division One, March 17, 1904.

1. **ALIENS: Right to Hold Real Estate.** The statute of 1895 declaring it to be "unlawful" for an alien to acquire land in this State by purchase does not mean that an alien in taking a deed to land is to be regarded as a lawbreaker or as one guilty of an offense, but it was only meant that the right which had been conferred on him by the act of 1872 to acquire and hold real estate just as a citizen could, had been withdrawn, and that the disabilities that the common-law had formerly imposed on him were now to be imposed by the statute except as in the statute itself provided.

2. ———: ———: **Meaning of Statute.** The provision of the statute of 1895 that "all property acquired, held or owned" by aliens "shall be forfeited to the State of Missouri" is an express recognition that real estate may be acquired by an alien, but whenever the State calls for it the alien shall surrender it, in the same way that the common law says; that is, his right to hold it can be questioned only by the State at the suit of the Attorney-General or the prosecuting attorney, but even then such suit can not be maintained if the alien becomes naturalized before office found.

3. ———: ———: **Abandonment: Setting Aside Purchase: Accounting.** Plaintiff, an alien, with no knowledge of the act of 1895, in 1898 acquired real estate and gave a mortgage thereon to the seller, which was foreclosed a year later and the defendant mortgagee became the purchaser. *Held,* that the plaintiff by his purchase acquired the title, and could by becoming naturalized during the time he held the property have perfected the title as against any claim the State might have set up for forfeiture, but having failed to become naturalized, his failure was a voluntary abandonment of his right to perfect the title, and hence the court can not rescind his purchase and compel the seller to render him an accounting.

Appeal from Nodaway Circuit Court.—*Hon. Gallatin Craig,* Judge.

AFFIRMED.

*P. L. Growney* for appellant.

(1)   Contracts involving the commission of acts *mala prohibita* are illegal and void.   Buckingham v. Fitch, 18 Mo. App. 91; Friend v. Porter, 50 Mo. App. 89; Swing v. Cider & Vinegar Co., 77 Mo. App. 397; Penn v. Bornman, 102 Ill. 523.   In this case the contract relating to the conveyance of the Buchanan county property by respondent to appellant as part consideration of his (appellant's), Nodaway county farm was made without adverting to the fact of alienage or of the Missouri law relating thereto.   Hence, the mistake made was mutual error. If any part of the consideration of an entire promise is illegal, the whole consideration is void.   Pelz v. Long, 40 Mo. 532; Summers v. Summers, 50 Mo. 340; Bick v. Seal, 45 Mo. App. 475; Friend v. Porter, 50 Mo. App. 89; Huttig Sash and Door Co. v. McMahon, 81 Mo. App. 440.   (2)   The mistake resulting from these circumstances is nothing more than, "that result of ignorance of law or of fact which has misled a person to commit that which if he had not been in error he would not have done."   Story, Equity, sec. 110, note 1.   I am aware of the rule that, where a party by his contract creates a duty or charge upon himself, he is bound to make it good, notwithstanding accident or unforeseen difficulties.   Yet this rule is qualified in this respect, viz.:  If doing the thing contracted for becomes unlawful (or ascertained to be unlawful), performance becomes impossible by force of law, and non-performance is excusable.   People v. Manning, 8 Cow. 297; Wolf v. Howes, 20 N. Y. 197; Monsey v. Drake, 10 Johns. 27; Dermot v. Jones, 2 Wall. 1; Jones v. Judge, 4 Comst. 412; Cowan v. Ins. Co., 50 N. Y. 610.   (3)   All written instruments between the same parties, executed at the same time, relating to the same subject-matter, are to be considered and construed together.   Brumlee v. Arnold, 60 Mo. 79; Owings v. McKinzie, 133 Mo. 323;

McDonald v. Wolf, 40 Mo. App. 302; Cleveland Park Lot. Inv. Co. v. Campbell, 65 Mo. App. 109; Houch v. Frisbee, 66 Mo. App. 16. But whether the contract remain executory or is fully executed, yet if the elements exist that justify a rescission and the *status quo* may be restored, the distinction is immaterial. Where parties enter into a contract and it is performed by one party and afterwards performance by the other is forbidden by law (or ascertained to be forbidden by law), it is the duty of a court of equity to declare the contract rescinded by law if things remain in such a position that the parties can be placed in their original situation. Rooks v. Seaton, 1 Phila. 106, 7 Leg. Int. 183; Shellington v. Howland, 53 N. Y. 375; Hanyer v. Abbott, 6 Wall. 352; Semmes v. Ins. Co., 13 Wall. 158. (4) The contract and the performance of it (if so termed), relating to the Buchanan county property was illegal and void. "The law never creates or imposes on any one a duty to perform what God (or the law) forbids, but it allows people to enter into contracts as they please provided they do not violate the law." School Dist. v. Dauchy, 25 Conn. 530; Whittemore v. Sills, 76 Mo. App. 248. A contract prohibited by statute, either expressly or by implication, is illegal and unlawful and can not be enforced. Gilliland v. Philips, 1 S. C. 152; Swords v. Owen, 43 How. 167; Fowler v. Scully, 72 Pa. St. 456; Dillon v. Allen, 46 Ia. 299; Railroad v. Seely, 45 Mo. 212; Swing v. C. & V. Co., 77 Mo. App. 397; Live Stock Assn. v. Cattle Co., 138 Mo. 406; Downing v. Ringer, 7 Mo. 585; Penn v. Bornman, 102 Ill. 523; Melchoir v. McCarty, 31 Wis. 252; Ins. Co. v. Ins. Co., 11 Humph. 1. A party may avoid a contract and recover back his property after his discovery of the law and the facts showing the sale to have been illegal. Burkholder v. Beetom, 65 Pa. 496; Stanley v. Chamberlain, 39 N. J. L. 565; Knowlton v. Congress & Emp. Co., 103 U. S. 347. (5) Respondent by his pleading admits that he was not aware of appel-

lant's alienage and says "he does not know, nor has he any knowledge or information thereof sufficient to form a belief." It may be conceded that respondent being a citizen and knowing the law, would not have entered into an illegal contract if he had been aware of the fact. Hence, "they were both mistaken and the contract which they both intended to establish on that foundation falls when the foundation itself is discovered to have no existence and in such case it is immaterial that the party pleading the mutual mistake was negligent in seeking information." Koontz v. Bank, 51 Mo. 275; Bank v. Allen, 59 Mo. 310; Griffith v. Townle, 69 Mo. 13; Matthews v. Kansas City, 80 Mo. 231; Pollock on Contracts, p. 412; Bank v. Eltinge, 40 N. Y. 391; Nordyke Marmon Co. v. Kehlor, 155 Mo. 654; Knowlton v. Congress Empire Sp. Co., 103 U. S. 347; Merritt v. Milord, 4 Keyes 208; Lowell v. Railroad, 23 Pick. 24; White v. Bank, 22 Pick. 181; Thomas v. City of Richmond, 12 Wall. 349; Ryan v. Ryan, 97 Ill. 38; Walton v. Tuston, 49 Miss. 569.

*E. A. Vinsonhaler* and *S. P. Huston* for respondent.

(1)   The spirit and expressed intent of the act of 1895 was not to declare a forfeiture of lands then held by aliens, but only to affect any increased holding. The act imposes no limitation whatever on uses which the alien might make of lands which he then held. He might sell or exchange them for other lands of equal trade value and of equal character of title—that is, an equity for an equity, and if the alien did so exchange them, then he acquired no additional land. The difference was not in his holding, but only in changing its locality. Therefore, such exchange was not within the purpose, intent or spirit of the act of 1895. At common law in such cases livery of seizin was not necessary. Devlin on Deeds (2 Ed.), sec. 14, p. 20. "In a mere exchange of trust property there is no alienation of the

estate of the *cestui que trust.*'' Hawley v. James, 5
Page 318. ''The intent of the lawmaker is the spirit
which the court will enforce.'' State ex rel. v. Hos-
tetter, 137 Mo. 636; Kane v. Railroad, 112 Mo. 34; State
v. Kane, 49 Mo. App. 398; Proctor v. Railroad, 64 Mo.
112; Schwenker v. McLaughlin, 139 Mo. 333.   (2)  Ap-
pellant attempts and bases his right to recover solely
upon the allegation that he has violated the law, and in
such case courts of equity will not.assist him or build a
bridge to enable him to escape from the result of his
own illegal act, especially as he knew the fact of alien-
age and suppressed it from the other party who did
not know such fact.   The contract was completely ex-
ecuted by both parties, and even if respondent had
known of the fact of appellant's alienage, a court of
equity would leave the parties where it found them.
Much more is this true where the party seeking the
relief knew the fact and the other did not.   Dickson v.
Kempinski, 96 Mo. 258; St. Louis Fair Association v.
Carmody, 151 Mo. 566; Ullman v. St. Louis Fair Ass'n,
167 Mo. 273.   (3)  Appellant is estopped under his peti-
tion and testimony and under all the testimony in the
case in his own person and for his own gain, from rais-
ing the question of his alienage.   Because he gave no
sign for three years and five months after the contract
was completely executed and after respondent had
greatly improved the farm, and after there had been a
very large advance, generally, in farm values, and then
asks the court to assist him in getting rid of the results
of his own alleged unlawful act.   In other words, he
asks that a law made to punish the alien be so construed
as to aid the alien and punish the citizen, and that, too,
when he knew the fact and the citizen did not.   He seeks
to profit by his own wrong.   Ryan v. Growney, 125 Mo.
483; Reed v. Johnson, 27 Wash. 42; Reinhold v. Lead
Co., 107 Mo. 16; Broadwell v. Merritt, 87 Mo. 95; Ben-
evolent Society v. Murray, 145 Mo. 602.   Respondent
would be estopped by his deed of general warranty from

claiming the land. Ragan v. McElroy, 98 Mo. 351. But estoppels are mutual. Bank v. Mathews, 8 Otto (U. S.) 621. (4) Whenever a declaration of intention to become a citizen is made, it removes all disqualifications and relates to the time of the execution of the deed. Manual v. Wulff, 152 U. S. 505; 1 Devlin on Deeds, secs. 124, 127, 132; Jones on Real Property, secs. 166-7; Halstead v. Board of Commissioners, 56 Ind. 363; Wall v. Riley, 49 Mass. 290; Hepburn v. Dunlap, 1 Wheat. (U. S.) 198; Belden v. Wilkinson, 68 N. Y. S. 205; Doe v. Robertson, 11 Wheat. (U. S.) 351; In re Kroadsky, 4 U. S. Land Dec. 564; Osterman v. Baldwin, 73 U. S. (6 Wall.) 116; Jackson v. Beach, 1 Johns. 399; Baker v. Westcott, 73 Tex. 134; Harley v. State, 40 Ala. 689; Sellchrist v. Scrimp, 35 Tex. 326. "Having declared his intention to become a citizen that act of naturalization has a retrospective effect validating his previous purchase." Ragan v. McElroy, 98 Mo. 349. (5) At common law, though an alien by accepting a conveyance violated the law and made himself amenable to the State, yet as the only person concerned was the State, the alien took a defeasible estate and could hold until inquest of office found by the State—that is, until there was a judgment judicially finding the alienage and declaring a forfeiture. Jones on Real Property, sec. 167; Belden v. Wilkinson, supra; Osterman v. Baldwin, 6 Wall. 121; Doe v. Robertson, 11 Wheat. (U. S.) 332; Haunstein v. Lynhan, 100 U. S. 483; Manuel v. Wulff, 152 U. S. 532; Fairfax v. Hunter, 7 Cranch (U. S.) 603; Phillip v. Moore, 100 U. S. 268; Scouten v. Wright, 30 Mass. 523; Quigley v. Birdseye, 11 Mon. 439; 2 Am. Dig. (Cen. Ed.), 118; Devlin on Deeds (2 Ed.), sec. 127, p. 151; Baker v. Westcott, 73 Tex. 129; Raccoulat v. Sauserian, 32 Cal. 386; Sellchrist v. Scrimp, 35 Tex. 326; Phillip v. Moore, 10 Otto (U. S.) 208; Carlon v. Altman & Co., 28 Neb. 676; Meyers v. Gavrock, 39 Neb. 843; Fritts v. Palmer, 132 U. S. 282; Seymour v. Mining Co., 153 U. S. 523; Hickory Farm

Co. v. Rade, 32 Fed. 22; McKinley v. Alaska Co., 183 U. S. 563; Bank v. Whitney, 13 Otto (U. S.) 99; St. Louis Drug Co. v. Robinson, 81 Mo. 18; Conn. Ins. Co. v. Smith, 117 Mo. 261; Hall v. Bank, 145 Mo. 425; Devlin on Deeds (2 Ed.), vol. 1, sec. 121. (6) The Act of 1872 removed all restrictions imposed by the common law on aliens as to the acquisition and the holding of real estate. Laws 1872, p. 79; R. S. 1889, sec. 342. The Act of 1895 was simply a modified re-enactment of the common law rule. Laws 1895, p. 207; R. S. 1899, pp. 1133-4. The common law, having been repealed by the Act of 1872 could not be reinstated by the mere repeal of that act, but required a re-enactment of that law or such part of it as the Legislature saw fit to enact. State v. Slaughter, 72 Mo. 484; State v. Booher, 71 Mo. 632. (7) Then if the title passed, though it was subject to forfeiture at the instance of the State, yet the alien might convey it before office found, or proceedings commenced for that purpose, and give a good title by a good faith conveyance to a citizen. Note to the case of Inglis v. Sailors Snug Harbor, 1 Sherwood & Budd's Leading Cases on American Law of Real Property, p. 501; Devlin on Deeds (2 Ed.), sec. 131, p. 155; 1 Washburn on Real Property (4 Ed.), sec. 22, p. 74; Jones on Real Property, secs. 166, 167, pp. 147-9.

VALLIANT, J.—This is a suit in equity to rescind a contract of sale or exchange of real estate.

There is no dispute about the material facts. In March, 1898, the plaintiff owned an equity in 440 acres of land in Nodaway county the legal title to which was held by Edward Hayes; the land was estimated to be worth $16,000. At that date the defendant owned certain city real estate in St. Joseph which was estimated to be worth $8,000. The plaintiff owed a debt to Hayes secured on the Nodaway county land which he estimated to be about $8,000. On the date above named the plaintiff and defendant made an agreement to ex-

change their properties, the plaintiff to give the Nodaway farm for the St. Joseph property, the defendant to pay Hayes the $8,000 incumbrance, thus equalizing the values. But it was understood between the parties that the amount due Hayes might, on a careful statement of the account, turn out to be more than $8,000, and it was agreed between them that if it should so result, the defendant was to pay the additional sum to Hayes, and the plaintiff was to give his notes to the defendant to reimburse him for such additional outlay, and secure·the notes by deed of trust on the St. Joseph property.

The contract was executed as agreed. When they came to settle with Hayes it was found that instead of $8,000, the plaintiff owed him $12,500. The defendant paid Hayes $12,500, Hayes at the request of plaintiff made a deed of the Nodaway farm to defendant, the defendant made a deed of the St. Joseph property to plaintiff, the plaintiff executed his notes amounting to $4,500 payable to defendant, and secured them by a deed of trust on the St. Joseph property. The defendant went into possession of the Nodaway farm and the plaintiff into the St. Joseph property, and they so continued until more than a year when, default being made in the payment of the first note given by plaintiff to defendant, the latter caused the deed of trust to be foreclosed and at the trustee's sale the defendant purchased the St. Joseph property and took possession thereof. That was on May 10, 1899. Nothing else occurred between the parties until August, 1901, when this suit was begun.

The plaintiff in his petition states and the evidence shows that he is a native of Ireland, and that during all the time covered by the transactions above mentioned he was a subject of the sovereign of the United Kingdom of Great Britain and Ireland. He also stated in his petition, and so testified at the trial, that he did not know when he had these business transac-

tions with the defendant that by the law of this State enacted in 1895 it was unlawful for an alien to acquire real estate by purchase; that the defendant did not know that he was an alien; therefore, with plaintiff's ignorance of the law and defendant's ignorance of the fact, they made the contract under mutual mistake; that in April, 1899, the plaintiff learned what the law on this point was, and then he abandoned all effort to redeem the city property from the $4,500 deed of trust. The record shows that the plaintiff was a resident of Nodaway county at the time of these transactions and had resided there continuously since 1881; that he acquired his title to the Nodaway county land in question before the Act of 1895 relating to the ownership of real estate by an alien was passed.

The prayer of the petition is to rescind the contract by which the properties were exchanged, state an account, and adjust the rights of the parties, and restore to him the Nodaway county farm.

There was a finding and judgment for the defendant dismissing the plaintiff's bill, and the plaintiff appeals.

The act of 1895 above referred to is now contained in sections 4764, 4765, and 4766, Revised Statutes 1899, which are as follows:

Section 4764. "It shall be unlawful for any person or persons not citizens of the United States, or who have not lawfully declared their intention to become such citizens, or for any corporation not created by or under the laws of the United States or of some State or territory of the United States, to hereafter acquire, hold or own real estate so hereafter acquired, or any interest therein, in this State, except such as may be acquired by inheritance or in good faith in the ordinary course of justice in the collection of debts: Provided, that the prohibition of this section shall not apply to cases in which the right to hold or dispose of lands in the United States is secured by existing treaties to the

citizens or subjects of foreign countries; which rights, so far as they may exist by force of any such treaty, shall continue to exist so long as such treaties are in force, and no longer."

(Section 4765 relates to the acquiring of real estate by corporations whose stock is held by aliens.)

Section 4766. "All property acquired, held or owned in violation of the provisions of this chapter shall be forfeited to the State of Missouri, and it shall be the duty of the Attorney-General, or circuit or prosecuting attorney of the proper city or county, to enforce every such forfeiture by bill in equity or other proper process. And in any suit or proceeding that may be commenced to enforce the provisions of this chapter, it shall be the duty of the court to determine the very right of the matter, without regard to matters of form, joinder of parties, multifariousness, or other matters not affecting the substantial rights, either of the State or of the parties concerned, in any such proceeding arising out of the matters in this chapter mentioned."

Appellant interprets these statutes to mean that the acquiring or attempting to acquire by an alien title to real estate is an act denounced as wrong, a violation of law, and for that reason the act is absolutely void.

To reach that conclusion appellant adheres to the letter of the statute: "It shall be unlawful for any person or persons not citizens," etc., to acquire real estate. That form of expression is often used in statutes forbidding an act and classing it as criminal, and when so used it means what appellant thinks this statute means, but it is not always used in that sense. To get at the true meaning of language employed in a statute we must look at the whole purpose of the act, the law as it was before the enactment and the change in the law intended to be made.

The common law on this subject is thus expressed by the author in 1 Jones on Real Prop. in Con., sec.

163: "At common law, aliens could not acquire and hold land by a secure title. The crown or the State could claim land held by them or for their benefit. Coke says: 'If an alien, Christian or infidel, purchase houses, lands, tenements, or hereditaments to him and his heirs, albeit he can have no heirs, yet he is of capacity to take a fee simple, but not to hold. For upon office found the king shall have it by his prerogative of whomsoever the land is holden. And so it is, if the alien doth purchase land and die, the law doth cast the freehold and inheritance upon the king. If an alien purchase any estate or freehold in houses, lands, tenements, or hereditaments, the king upon office found shall have them.' "

The same learned author further says:

"166. The common law made a distinction between the disability of an alien to take by purchase and his disability to take by inheritance; for while an alien could acquire a defeasible title to land by devise or deed, he could take no title whatever by mere operation of law, as by descent, by right of curtesy, or by right of dower. The title which an alien acquired by purchase or devise he could hold until office found, and he could, until such proceedings were taken, convey the land and confer title upon a purchaser. If the alien dies without having made a conveyance, the land vests immediately by escheat in the State without any inquest of office.

"167. Statutes restricting or denying the right of aliens to hold real property can be enforced only by a direct proceeding by the Attorney-General to enforce a forfeiture. An alien's right to hold land can not be questioned by an individual in any collateral action. It is a matter between the State or supreme authority and the alien. Until office found, or an official ascertainment of alienage and a judgment of forfeiture, an alien may hold real estate against every one and even against the State or government. If he becomes a citizen, or otherwise becomes qualified to hold land, before a for-

feiture is declared in favor of the State or government, his title becomes perfect even as against the State or government.''

In Fairfax v. Hunter, 7 Cranch 603, l. c. 619, the Supreme Court of the United States, per Mr. Justice STORY, said: ''It is clear by the common law, that an alien can take lands by purchase, though not by descent, or in other words he can not take by act of the law, but he may by the act of the party. This principle has been settled in the year books, and has been uniformly recognized as sound law from that time. [11 Hen. 4, 26; 14 Hen. 4, 20; Co. Litt., 2b.] Nor is there any distinction whether the purchase be by grant or by devise. In either case, the estate vests in the alien (Pow. Dev. 316, etc.; Park Rep. 144; Co. Litt., 2b), not for his own benefit, but for the benefit of the State; or in the language of the ancient law, the alien has the capacity to take, but not to hold lands, and they may be seized into the hands of the sovereign. [11 H. 4, 26; 14 H. 4, 20.] But until the lands are so seized, the alien has complete dominion over the same. . . . And may convey the same to a purchaser.''

Before Texas became a State in the Union its constitution forbade the holding of real estate by an alien. One Baldwin who was a citizen of New York, and therefore as to Texas was an alien, bought certain lots in Galveston and received certificates of his purchase, but being aware of his personal disability to hold the real estate he caused the deed to be made to one Holman for him. There was an execution levied on the land as the property of Holman, the land was sold by the sheriff and bought by one Osterman who, when he purchased, knew the character of Holman's title. In a suit between Osterman and Baldwin for the land the Supreme Court of the United States, per Mr. Justice DAVIS, said: ''Until office found Baldwin was competent to hold land against third persons. No one has any right to complain in a collateral proceeding, if the sovereign does

not enforce his prerogative. . . . Even if the defendants could have made this objection, while the Republic of Texas existed, they can not make it now, because, when Texas was admitted into the Union, the alienage of Baldwin was determined. His present status is that of a person naturalized, and that naturalization has a retroactive effect, so as to be deemed a waiver of all liability to forfeiture, and a confirmation of his former title.'' [Osterman v. Baldwin, 73 U. S. 116.]

The same doctrine has been reuttered by that court, and declared by other courts in numerous decisions which will be found by reference to the brief of the learned counsel for respondent.

We see, therefore, that by the common law the pliantiff in the case at bar would have acquired the title to the St. Joseph property and would have held it against the claim of every one except the State of Missouri, and could at any time before office found have perfected his title even as against the State, by becoming naturalized.

That being the condition of the plaintiff's right, if it were to be judged under the common law, what was it under our statute?

The right of an alien to acquire and hold real estate has been the subject of legislation in this State, from time to time, from an early date, the earlier statutes conferring qualified rights in that respect upon him.

In 1872 our General Assembly enacted that: ''Aliens shall be capable of acquiring, by purchase, devise or descent, real estate in this State, and of holding, devising or alienating the same, and shall incur the like duties and liabilities in relation thereto as if they were citizens of the United States and residents of this State.'' That statute passed into the revision of 1879 as section 325 and into that of 1889 as section 342, and was the law when the plaintiff acquired title to the Nod-

away county land, and was the law until 1895, when the act which is now sections 4764-5-6, above quoted, was enacted and which was the law when the transactions in question occurred.

The act of 1872 repealed those features of the common law which imposed disabilities on an alien in respect of his capacity to acquire and hold real estate. While that statute was in force an alien had as much capacity to acquire and hold real estate as a citizen had. But after an experience of more than twenty years under the operation of that statute our General Assembly concluded to change the policy of the State in that particular.

As the act of 1872 had repealed the common law on that point, it was at least doubtful, under section 4177, Revised Statutes 1899, if a mere repeal of that act would restore the common law, even if the Legislature had intended to restore it in its original form and effect; it was, therefore, doubtless deemed necessary in order to accomplish its purpose that the Legislature should by affirmative act withdraw from the alien the right that had been conferred on him by the act of 1872. When the Legislature in the act of 1895 said it shall be unlawful for an alien to acquire land by purchase, it did not mean that an alien in taking a deed to land was to be regarded as a lawbreaker or one guilty of an offense, but it only meant that the right that had been conferred on him by the act of 1872 was withdrawn, and that the disabilities that the common law had formerly imposed were now to be imposed by statute, except as in the statute itself otherwise provided. Some of the words of the statute give plausibility to the contention that title can not pass to the alien at all, the words being that it shall be unlawful for the alien "to hereafter acquire," etc., but when those words are taken with the immediate context that idea disappears. The language is that it shall be unlawful for the alien "to hereafter acquire, hold or own real estate so here-

after acquired." The sense is awkardly expressed; there could be "no real estate so hereafter acquired" if we give literal meaning to that part of the sentence which says that it shall be unlawful "to hereafter acquire" such property. This meaning is further shown by the language in the beginning of section 4766: "All property acquired, held or owned in violation of the provisions of this chapter shall be forfeited to the State of Missouri," etc.

That is an express recognition that real estate might be acquired by an alien after the passage of the act, but that whenever the State called for it the alien should surrender it. That is just what the common law was on that subject.

The act of 1895 was intended to reinstate the common law on the subject of the acquiring by purchase of real estate by an alien; under that statute an alien can take by purchase a defeasible title and hold it subject to the same conditions that the common law imposed.

The parties to the contract of March 3, 1898, violated no law when they entered into it, and the plaintiff, though an alien who had never declared his intention of becoming a citizen, took such a title to the St. Joseph property as constituted a sufficient consideration to support the contract. That title he held for more than a year, during which period the State made no demand on him, He could during that time have perfected his title by becoming a citizen. If he preferred to abandon his property rather than come under the terms of the law by which he could hold it, we can not consider it otherwise than a voluntary abandonment. He may have made the contract under the belief that he could acquire and hold the St. Joseph property without becoming a citizen, but the court can not relieve him from his contract because of his mistake in that respect. When he discovered, as he says he did,

in April, 1899, that he was under the disability of the act of 1895, he was probably also under a misconception as to his rights under that statute, he certainly was so if he then thought, as he now contends, that no title passed to him by the defendant's deed; but because of that mistake he is not entitled to rescind his contract.

Respondent presents further points which he thinks are sufficient to close the door of a court of equity against the appellant, one of which is that appellant rested from April, 1899, when he says he discovered the statute of 1895, until the summer of 1901, when he began this suit, without giving respondent any intimation that he was dissatisfied, allowing respondent in the meantime to make valuable improvements on the farm. We do not deem it necessary, however, to go into those other questions. The plaintiff was not entitled to a rescission of the contract on any theory presented by him.

The judgment is affirmed. All concur.