THE STATE ex rel. STANDARD TANK CAR COM-
PANY v. JOHN L. SULLIVAN, Secretary of
State.

In Banc, April 30, 1920.

1. **CORPORATIONS: No Par Value Stock: License to Do Business in This State.**  Corporations for profit, created under our general statutes relating to manufacturing or business companies, must have a capital stock composed of par-value shares.  But it does not follow that the policy of the State is to exclude from the privilege of a license to do business here every corporation, organized in another state for gain, with a capital stock not composed of par-value shares, merely because our laws withhold the privilege to create domestic companies with such stock.  The statutes providing for the admission of outside corporations do not expressly impose, as a condition of their admission into this State, that they have a capital stock divided into shares of a par or nominal value.

2. ———: ———: ———: **Corporations of Like Character.**  The general doctrine is that a legislative intention to exclude foreign corporations from a state is not to be deduced from the circumstance that the laws of the State have made no provision for the creation of domestic corporations of like character.

262    SUPREME COURT OF MISSOURI.

State ex rel. Tank Car Co. v. Sullivan.

3. ——: ——: ——: Nature of Business. The form of a company's capital stock is less material in its bearing on public interests than is the company's business; and less persuasive arguments can be advanced for excluding a company from a state because of the nature of its stock than because of the nature of its business, unless the stock is so formed as to be fraudulent or to promote fraud.

4. ——: ——: ——: Regulatory Provisions: Section 3037. The provisions of the statute (Sec. 3037, R. S. 1909) that no foreign corporation established or maintained in any way for the pecuniary profit of its members shall engage in any business except that expressly authorized by its charter or the laws of this State, was not meant to have the effect of excluding a foreign corporation, but was meant to regulate their corporate acts in this State; it does not prohibit the admission of a foreign corporation merely because its capital stock is of a kind not provided by our statutes.

5. ——: ——: ——: Comity. It is the disposition of the State, as manifested by its statutes, to be liberal in its comity towards outside corporations applying for admission into this State. A statute which seems to exclude them should not be more rigidly enforced than is compelled by its language when interpreted in reference to the purpose it was meant to conserve and the mischief it was meant to prevent.

6. ——: ——: ——: Identical Framework. Our statutes do not require that the framework of a foreign corporation, in order to be licensed to do business in this State, must be identical with the requirements prescribed by our statutes for the creation of domestic corporations.

7. ——: ——: ——: What May Be Excluded. Our statutes provide for the exclusion of only such foreign corporations as (1) are organized in respect to some feature of their internal economy unlike the arrangement provided by our laws for domestic companies and violative in that regard of our public policy and (2) such as are organized to engage in a business opposed to our public policy.

8. ——: ——: ——: Policy of State: How Ascertained. The sources of evidence of what is the policy of the State as to the admission of foreign corporations, are: first, the enacted laws of the State, (2) the decisions of its courts of review, (3) the prac-

State ex rel. Tank Car Co. v. Sullivan.

tice of the executive department of the State Government, and (4), presumably, the purpose to preserve *bonos mores* by keeping out everything tending towards fraud; and by none of these standards can an inflexible rule be established excluding a foreign corporation whose stock has no par value, in the absence of anything inherently fraudulent or contrary to good morals in the stock itself or the corporation organized with it.

9. ———: ———: ———: **Section 3343.** The words of Section 3343, Revised Statutes 1909, declaring that if a foreign corporation, seeking a license to do business in this State, "could not organize under the laws of this State, license shall be refused," do not compel the exclusion of a foreign corporation on the mere ground that a part of its capital stock has no par value. And in this case, where the only ground for refusing relator a license was that a large portion of its capital stock is non-par-value, although its assets are twice the par value of its preferred stock, the Secretary of State is commanded to issue the license.

10. ———: ———: ———: ———: **Liability of Stockholders to Creditors.** Nor does said Section 3343 exclude the foreign corporation which has non-par-value stock, on the ground that our laws make stockholders of a corporation liable to its creditors, if it becomes insolvent, for any balance remaining unpaid on the par value of the shares, where the laws of the State incorporating such a company make the stockholders liable to creditors for "the unpaid balance of the consideration for which such stock was issued by the corporation." The purpose of our laws in that respect is to prevent a company from creating a fictitious credit, and to compel subscribers to its stock to keep their agreements.

11. ———: ———: ———: ———: **Taxation in Lawful Manner.** The fact that the stock of the foreign corporation names no par value is no reason, if it is admitted to do business here, why it cannot be taxed in the manner provided by our laws. The amount of the tax it is required to pay depends upon the amount of its assets used in its business in this State.

11. ———: ———: ———: ———: **Corporations Exceeding Ten Million Dollars.** The provision of Section 3343 that a foreign corporation whose capital stock exceeds ten million dollars may obtain a license to do business in this State "if the proportion of the capital stock of such corporation employed in this State shall not exceed the capital stock domestic corporations are permitted to have," spends its force in an inhibition upon a foreign corporation employing a larger capital in this State than a domestic corporation can employ, and does not deny to a foreign corporation a license merely because its stock names no par value.

*Mandamus.*

PEREMPTORY WRIT GRANTED.

*Frumberg & Russell* for relator.

(1)  If the foreign corporation is legally qualified to do business in this State, and has complied with the law relating to foreign corporations, the Secetary of State has no discretion to refuse granting the license. Secs. 3037, 3039, R. S. 1909; State ex rel. v. Cook, 181 Mo. 596.   (2) All statutes *in pari materia* are to be construed together and their meaning is to be determined from a consideration of all their provisions.   State to use. v. Heman, 70 Mo. 441; Cole v. Skrainka, 105 Mo. 303.;   Kane v. Railroad, 112 Mo. 34;   Macke v. Byrd, 131 Mo. 682;   St. Louis v. Howard, 119 Mo. 41; Andrew County ex rel. v. Schell, 135 Mo. 31;   State ex rel. v. Woodson, 128 Mo. 497;   State ex rel. v. Klein, 116 Mo. 259.   (3)  In the construction of a statute, it is not to be presumed that the Legislature intended unnatural, oppressive, absurd or unreasonable consequences to result.   Riddick v. Governor, 1 Mo. 147; Connor v. Railroad, 59 Mo. 285;   State v. Emerson, 39 Mo. 80;   State ex rel. v. Field, 112 Mo. 554;   Kane v. Railroad, 112 Mo. 34;   State v. King, 44 Mo. 283;   Cole v. Skrainka, 105 Mo. 303; State ex rel. v. Railroad, 105 Mo. App. 207;   Perry v. Strawbridge, 209 Mo. 621; Rutter v. Carothers, 223 Mo. 631;   E. H. Darlington Lumber Co. v. Railroad, 216 Mo. 658;   State ex rel. v. Swanger, 190 Mo. 561.   (4)  A statute will be construed to accomplish the result and object necessarily intended by the Legislature, and ambiguities will be resolved in favor of a reasonable and natural interpretation of the language employed in the light of the circumstances surrounding its enactment and the evident object to be accomplished.   Neenan v. Smith, 50 Mo. 525;   Spitler v. Young, 73 Mo. 42;   Ross v. Railroad, 111 Mo. 18; Pugh v. Railroad, 118 Mo. 506;   Pembroke v. Huston,

180 Mo. 627;   Gist v. Rackliffe-Gibson Const. Co., 224 Mo. 369;   Murphy v. Railroad, 228 Mo. 56;   Decker v. Deimer, 229 Mo. 296;   St. Louis v. Williams, 235 Mo. 503;   In re Crouse, 140 Mo. App. 545;   Joplin Supply Co. v. West, 149 Mo. App. 78.   (5)   The policy of this State towards foreign corporations is one of liberal and friendly comity.   Secs. 3037, 3039, R. S. 1909; State ex rel. v. Cook, 181 Mo. 596.   (6)   The form and manner in which corporate stock shall be issued is a matter of private contract between the incorporators and effects the interests of no one but the incorporators; its regulation relates to the internal affairs of the corporation and it is not to be presumed that foreign legislation intends to regulate or deal with it.   State ex rel. v. Swanger, 190 Mo. 561;   In re Fryeburg Water Co., 106 Atl. (N. H.) 225;   North State Mining Co. v. Field, 64 Md. 151;   Kansas Const. Co. v. Railroad, 135 Mass. 34.   (7)   Foreign corporations are not excluded from doing business in another state by the mere fact that they issue stock in which the par value of each share is not expressed.   North American Petroleum Co. v. Hopkins, 181 Pac. (Kan.) 625.

*Frank W. McAllister*, Attorney-General, and *John T. Gose*, Assistant Attorney-General, for respondent.

(1)   The constitution contemplates corporations with capital stock of par value shares only.   Sec. 21, Art. 10, Mo. Const.;   State ex rel. v. Lesueur, 99 Mo. 558.   (2)   Capital stock with par value and fifty per cent thereof in good faith subscribed and actually paid, is a condition precedent to organization in this state under the statutes.   Sec. 3339, Laws, 1911, p. 148. (3)   A foreign corporation of such nature that it could not be organized under the laws of this State, cannot be licensed thereunder.   Secs. 3037, 3039, 3343, R. S. 1909.   (4)   Foreign corporations are licensed to do business in this State at the will of the State.   Hooper v. California, 155 U. S. 652;   Waters Pierce v. Texas, 177 U. S. 46; New York Life v. Cravens, 178 U. S. 397, affirming 148 Mo. 583; New York Life v. Cravens, 178

U. S. 389, 397, affirming Cravens v. New York Life, 148 Mo. 583. (5) The purpose of a proviso in an act is to except something from its operation which otherwise would have been within it. Black on Interpretation of Laws, p. 271, quoted in Brown v. Patterson, 224 Mo. 658.

GOODE, J.—Relator, the Standard Tank Car Company, is a corporation organized under the general statutes of the State of Delaware providing for the organization of corporations, has complied in all respects with those laws, and received a certificate of incorporation from said state, empowering it ''to engage in the business of manufactoring, producing, constructing, buying, selling and dealing in railway, passenger, freight, tank and street cars and railroad equipment and appliances.'' The number of shares of the capital stock authorized by the certificate of incorporation is 130,000, divided into 30,000 shares of eight-per-cent-cumulative preferred stock of the par value of one hundred dollars a share, or the total par value of $3,000,000, and 100,000 shares of common stock without par value. The place designated for the principal office is the City of Wilmington, Delaware. None of the incorporators were residents or citizens of the State of Missouri when the company was organized, and only one of the stockholders resides in this State. The principal business of the company, the manufacture of railroad equipment and appliances, is carried on in Turmbull County, Ohio, in which state the company has been licensed to do business as a foreign corporation. The company was not organized for the purpose of violating the laws of this State as to domestic corporations, but in good faith under the laws of Delaware, for the purpose of carrying on its business in Delaware and Ohio, and such other states as it might be licensed to enter. The preferred stock has been fully subscribed and paid in money and property equal to the full par value of the total number of preferred shares.

and the whole amount of the common stock has been sub-
scribed and paid for by over three million dollars in
money and property. The amount of the capital stock
paid in money was $156,185.84; the amount paid in real
estate was $2,675,800, and that paid in personal property
$3,174,863.11.

When the company was organized the laws of Dela-
ware empowered any corporation formed under them to
provide in its certificate of incorporation for the issuance
of shares of stock (other than those of the preferred
stock) without nominal or par value, and provided that
every share of that kind of stock should be equal to every
other share of such stock, unless the certificate of incor-
poration provided for different classes as to the voting
powers, restrictions or qualifications thereof; and that
such stock might be issued by the corporation from time
to time by the board of directors pursuant to authority
conferred by the certificate of incorporation or the stock-
holders; and that all of the shares of non-par value,
"the full consideration for which has been paid or de-
livered, shall be deemed full paid stock and not liable
to further call or assessment thereon, and the holder of
such shares shall not be liable for any payments." [Sec.
1918-A, 4-a, of Chap. 65, Revised Code of Delaware,
Amended Laws Delaware 1917, p. 321.] The laws of
Delaware also declare that for the purpose of the taxes
prescribed to be paid on the filing of the certificate re-
lating to corporation and franchise taxes, such shares
shall be taken to be of the par value of $100 each. [Afore-
said Sec. 1918-A, 4-a.] Those laws further provide that
the certificate of incorporation of a company having
no-par value shares of stock, shall set forth the amount
of its total authorized stock, the number of shares into
which it is divided, the amount of the capital stock the
company will commence business with, which shall not
be less than $1000, and shall also state the total number
of shares authorized to be issued without par value and
the number of shares the company shall commence busi-
ness with, which shall not be less than ten. [R. C. Del.

sec. 5, chap. 65, as amended by Laws 1917, p. 323.]
Said laws also prescribe that if the whole capital stock
of the corporation shall not be paid in, and the assets
shall be insufficient to satisfy the claims of its creditors,
"each stockholder shall be bound to pay on each share
held by him, the sum necessary to complete the amount
of the par value of such shares as fixed by the charter of
the company or its certificate of incorporation, or such
proportion of that sum as shall be required to satisfy the
debts of the company; in case of stock without par value,
this liability shall be limited to the unpaid balance of the
consideration for which said stock was issued by the cor-
poration, which said sum or proportion thereof, may be
recovered as provided for" in the laws of the state after
writ of execution against the corporation has been re-
turned unsatisfied, as provided in said laws. [Sec. 1934-
20, as amended in Laws 1917, p. 326.] Another statute
of the state says the subscription to the capital stock
"shall be paid in such amounts and in such times as
the directors may require, and the directors are authoriz-
ed to assess charges on stock not fully paid from time
to time, as the necessities of the business may require,
not exceeding, in case of stock without par value, the
consideration for which said stock was issued by the cor-
poration." [Sec. 1935-21, as amended in Laws 1917, p.
327.]

The foregoing statement and citations are, accord-
ing to the allegations of the petition in this case, the
object of which is to compel the respondent, the Secre-
tary of State of Missouri, to issue to relator a license
to transact business in Missouri as a foreign corporation.

Other averments are made to show the acts required
by our statutes to be done by a foreign corporation in
order to obtain a license to carry on business in this
State, have been done by relator. Those averments are
concerning formal matters and no point is made about
them.

The petition alleges respondent refused to issue a
license or certificate to relator, authorizing it to conduct

business as a foreign corporation in this State, for the reason that part of its capital stock had no par value, and, therefore it could not have been organized as a domestic corporation; because the statutes of this State provide, in effect, against any foreign corporation that could not be organized under our laws receiving a license to do business here. Five exhibits were filed with the petition, one of them being an agreement containing various stipulations for the consolidation of two other companies with relator; the second is the affidavit of the president of relator, setting forth the business relator desires to engage in if it is licensed; the third is a verified statement showing the proportion of its capital stock represented by real estate and personal property, with the cash value of each item used in paying up the capital stock of the company; the fourth is an affidavit that relator has not created or entered into any pool, trust, combination or agreement in restraint of trade, or to create a monopoly, etc.; the fifth is an affidavit regarding the preferred capital stock and the common stock without par value, giving the amounts as heretofore stated. Relator's certificate of incorporation, issued by the Secretary of State of Delaware, is not exhibited.

An alternative writ of mandamus, in the usual form, was issued by this court on the presentation of the petition, and for his return to the writ respondent filed a demurrer, setting forth that the alternative writ did not state facts sufficient to constitute a cause of action or entitle relator to the relief prayed, or justify the granting of a peremptory writ.

It is proper to say the refusal of respondent to issue a license to relator to transact business in Missouri was not due to an obstructive spirit, but to a doubt as to whether under our stututes, he was authorized to grant a license. Relator is a manufacturing and business company of the kind which may be formed under Article VII, Chapter 33, Revised Statutes 1909. Section 3342 in that article says, in substance, no corporation organized under the laws of any other State, which if organized in this State, would do so under

Article VII, shall do business here without procuring a license from the Secretary of State. Section 3343, immediately following, says that in order to procure a license, the foreign corporation shall file with the Secretary of State a copy of its articles of association and charter, and if it shall appear that such company or corporation could not organize under the laws of this State, the license shall be refused. Section 3339 prescribes what statements regarding the plan on which a manufacturing and business company is to be formed, shall be set forth in the articles of agreement, executed by the incorporators; and the third matter required to be stated in the articles relates to the amount of the capital stock, the number of shares into which it is divided, the par value thereof, and that ''fifty percent of the authorized capital stock has been in good faith subscribed and actually paid up in lawful money of the United States or in property of the full value thereof, and is in the custody of the persons named as the first board of directors or managers.'' There must be mentioned in the articles the names and places of residence of the several shareholders and the number of shares subscribed by each. Other provisions of the section are that no stock shall be issued by the corporation except such as is fully paid in money or in property equal to the par value of the stock; further, that ''all stock of the corporation not subscribed and paid for at the time of its organization, may be sold at its par value by said corporation.'' In consequence of those various statutory provisions and others relating to corporations and their capital stock, respondent thinks that probably he is without authority to license a foreign corporation to engage in business in the State, if part of its stock has no nominal or par value. The gist of the argument is that the article providing for the formation of domestic manufacturing and business companies, imports that a company formed under the article and probably any kind of corporation formed for gain, can issue only stock with a par value, and that respondent is forbid-

den to license a foreign manufacturing and business company possessing charter powers of a kind that would prevent its formation under the article. This is the only point made against the sufficiency of the alternative writ to state a case entitling relator to the relief prayed, and is the only one we will consider.

The decision of the case turns on the meaning of the words of Section 3343 of the statutes: ''If it shall appear such company or corporation could not organize under the laws of this State, license shall be refused,'' construed in connection with such other sections as relate to the same subject-matter and throw light on the inquiry. If interpreted literally, the quoted clause would preclude the granting of a license to relator; for Article VII contemplates the formation under it of no company with a capital stock divided into shares, all or part of which are without a par value. Section 3339, in said Article VII, requires articles of association of any company formed under the article, to set out the amount of the capital stock of the proposed corporation, the number of shares into which it is divided, and the par value thereof, etc. Other statutory provisions take for granted that domestic corporations organized for gain will have a capital stock divided into shares having a par value; and it has been held such companies must have at least some sort of capital stock. [State ex rel. y. Lesueur, 99 Mo. 552, 558.] So it may be accepted as the law of this State, that corporations for profit, created under our general statutes regarding manufacturing and business companies (Art. VII, R. S. 1909), must have a capital stock and one composed of par-value shares, and that there is no law authorizing the formation of said class of corporations with a stock not thus divided; though there are sections of the statutes authorizing non-stock business corporations, namely, several kinds of mutual insurance companies. [R. S. 1909, Articles X, XI and XII, Ch. 61.] But it does not follow that the policy of the State is to exclude from the privilege

of a license to do business here, every corporation organized in another state for gain, and with a capital stock not composed of par value shares, merely because our laws withhold the privilege to create domestic companies with such stock. The section providing for the admission of outside corporations nowhere expressly imposes, as a condition of their admission into the State, that they must have a capital stock divided into shares of a par or nominal value; but some of those sections speak of the capital stock of foreign corporations which apply for a license to do business here, and require from them the filing of a sworn statement, giving the entire amount of the capital stock and the proportion thereof that will be used in the business of the company in Missouri. [R. S. 1909, sec. 3039.] That requirement and other references in the statutes to the matter, show the enactments of the Legislature about the admission of foreign business corporations, were made under the influence of a tacit assumption that all such companies would have capital stocks of a definite amount and perhaps distributed into par-value shares; as business corporations are usually thus capitalized. But if this is true, it does not necessarily imply an intention on the part of the Legislature to exclude from the State corporations not thus capitalized, if such companies existed at the dates of the several enactments regulating admission to the State or have come into existence since; but rather indicates that the Legislature was prescribing the steps to be taken by business companies, constituted as such companies usually are, to obtain a license, without contemplating or intending the exclusion of other companies somewhat differently constituted. The general doctrine is that an intention to exclude foreign corporations from a state is not to be deduced from the circumstance that the laws of the State have made no provision for the creation of domestic corporations of like character. [8 Fletcher, Ency. Corp. sec. 5740, pp. 9402, 9403; People ex rel. v. Fidelity & Cas. Co., 153 Ill. 25, 26 L. R. A. 295;

Stevens v. Pratt, 101 Ill. 206; U. S. Fid. & Cas. Co. v. Linehan, 73 N. H. 41; Stump v. Sturm, 254 Fed. 535, 551.]

The first of the cases cited was a *quo warranto* proceeding filed by the State's Attorney of Peoria County, Illinois, to test the right of the defendant company to exercise in the State of Illinois, a franchise to write policies for several classes of insurance, such as accident, employers' liability, steam boiler, etc. The defendant company was organized under the laws of New York and empowered by its charter to issue policies covering those kinds of risks. It had been granted a license to do the like business in Illinois, but its right was questioned in the *quo warranto* proceeding. No company could be organized in Illinois to enter into contracts for different kinds of insurance, and that state of the law was asserted to preclude the New York company from doing more than one kind of business in Illinois. On this question the Supreme Court of that State, at page 298, 26 L. R. A., said:

"It seems to be one of the contentions of appellant, that, since a company cannot be organized under the laws of this State to do the different classes of insurance business done by appellee, therefore there is an implied prohibition that forbids the transacting of a multiform insurance business by one and the same company within the limits of the State; in other words, that the doing of such multiform insurance business is in violation of the spirit of its laws. We are not satisfied of the soundness of this position. It is admitted that our statutes do not in express terms prohibit a company from doing more than one kind of insurance. The rule is that, where there is no positive prohibitive statute, the presumption, under the law of comity that prevails between the States of the Union, is that the State permits a corporation organized in a sister state to do any act authorized by its charter or the law under which it is enacted, except when it is manifest that such act is obnoxious to the policy of the law of this State.

282 Mo.—18

"In Stevens v. Pratt, 101 Ill. 206, it was held by this court that the mere absence of legislation authorizing the formation of a particular class or kind of corporations does not show that it is against public policy to create such corporations, but that such public policy must be expressed in some affirmative way. In Cowell v. Colorado Springs Co., 100 U. S. 55, the Supreme Court of the United States said: 'If the policy of the State or Territory does not permit the business of the foreign corporation in its limits, or allow the corporation to acquire or hold real property, it must be ˙ expressed in some affirmative way; it cannot be inferred from the fact that its Legislature has made no provision for the formation of similar corporations, or allows corporations to be formed only by general laws. Telegraph companies did business in several states before their legislatures had created or authorized the creation of similar corporations; and numerous corporations existing by special charter in one state are now engaged without question in business in states where the creations of corporations by special enactment is forbidden.' And see also Christian Union v. Yount, 101 U. S. 356."

In Stevens v. Pratt, 101 Ill. 206, 216, the question was examined with much care, as the court found it necessary to overrule a prior decision given in U. S. Mortg. Co. v. Gross, 93 Ill. 483. One of the questions involved was whether an outside corporation created to lend money could be admitted to do that business in the State in view of the following part of the statute: "Corporations may be formed in the manner provided by this act, for any lawful purpose except banking, insurance, real estate brokerage, the operation of railroads, and *the business of loaning money.*" The court, in overruling the prior decision, held the statute had been misconstrued in treating it as though it entirely prohibited the formation of corporations to lend money; whereas it only prohibited their formation under the particular act. But the opinion dealt also with the question of whether the act meant to exclude foreign

corporations from the State by a clause in it which said that "foreign corporations, and the officers and agents thereof, doing business in this State, shall be subject to all the liabilities, restrictions and duties that are or may be imposed upon corporations of like character, organized under the general laws of this State, and have no other or greater powers;" a clause the same as one contained in our statutes. [Clause 2, Sec. 3037, R. S. 1909.] In the previous decision the court held that in consequence of said statutory provision, foreign companies organized to lend money could not be permitted to pursue that business in the State of Illinois. In the later case the opinion points out that the quoted language is entirely regulatory and restrictive, and not prohibitive, and argues the proposition in this way:

"No corporation is granted the right to do business in the State (i. e. by said provision.) No corporation is excluded from doing business in this State. Simply 'foreign corporations, and the officers and agents thereof, doing business in this State,' are placed on an equality, to the extent that they shall exercise no greater or different powers, and shall be subject to the same regulations and restrictions, and governed by the same rules of law in these respects, with corporations of like character organized or to be organized under the general laws of this State . . . *It cannot be said that the failure to provide for the organization of other corporations, by general laws, is an exclusion of foreign corporations of like character, unless it shall be held that the failure to enact such general laws is an evidence that they are opposed to our policy.*" (Our emphasis.)

The court then went on to show the State had not manifested in its statutes, or in other ways, an opposition to the lending of money by corporations, and, therefore, such companies ought not to be excluded for reasons of public policy.

In U. S. Fid. & Cas. Co. v. Linehan, 73 N. H. 41, a writ of mandamus was prayed by the plaintiff, a cor-

poration organized in Maryland, and by its charter authorized to engage in the business of issuing both indemnity and burglary insurance policies. It had been licensed to engage in New Hampshire in the indemnity insurance business, but a license to issue burglary policies was refused by the defendant, who was the Insurance Commissioner of the State. The court held that in the absence of express legislation against transacting a particular kind of business in a state, a corporation is generally held to possess the right by comity to transact its business in states other than the one of its domicile, and that if the Legislature is silent on the subject, this is equivalent to permission. [Citing 2 Mor. Corp. secs. 960, 961; Cowell v. Springs Co., 100 U. S. 55, 59.] The court said further:

"A state policy may be as thoroughly established in this way as by positive enactment. If the Legislature does not see fit to prohibit a foreign corporation from carrying on its business here, when it is not repugnant to common-law principles, it in effect declares the public policy of the State to be favorable to its engaging in business here. The presumption of legislative intention, founded upon the doctrine of comity, affords ample evidence in support of that conclusion." [L. c. 42.]

The opinion cited the case of People v. Company, 153 Ill. 25, and approved the holding therein that if there was no prohibition in the statute of the business of multiform insurance, the comity prevailing among the states permitted a foreign corporation to do such insurance business in any state, although no law of the state authorized the formation of companies for such a purpose.

In Stump v. Sturm, 254 Fed. 535, the question was as to the title to a tract of land, one of the parties claiming title under a deed made to a Home Mission Society, an incorporated company. The validity of the deed was attacked on the ground of the exercise of undue influence over the grantor to procure the conveyance, and also on the ground that the Home Mission Society could not take title to the land under the laws of West Virginia, be-

cause, among other reasons, no such corporations could be organized under the laws of the State. As to this point the court, at page 551, said:

"We are further of the opinion that where a state does not provide for the granting of a charter to domestic corporations of a certain character, such non-action on its part is not in the nature of a prohibition against foreign corporations created for such purpose."

Other authorities to the same effect might be cited. Those adjudications answer in the negative the question of whether an outside company formed to carry on a business which a domestic company cannot be created to conduct, is, from this sole fact, to be kept out of a state. They do not consider the question of whether a difference in the internal economy of foreign companies from that of domestic companies is enough to exclude the former from a state. That proposition has never been asserted, so far as we know. The form of a company's capital stock is plainly less material in its bearing on public interests, than the company's business; and less persuasive arguments can be advanced for excluding a company from a state because of the nature of its stock than because of the nature of its business, unless the stock is so formed as to be fraudulent or to promote fraud. Hence the decisions we have reviewed are in point on the question we are discussing.

As said by the Supreme Court of Illinois in Stevens v. Pratt, 101 Ill. l. c. 216, the statutory proviso that foreign corporations shall be subject to all the liabilities, restrictions and duties that are or may be imposed upon corporations of like character organized under the general laws of this State, and have no other or greater powers, was not meant to have the effect of excluding foreign corporations, but to regulate their corporate powers in a state other than the one of their origin. As much may be said of another clause of our statutes, to-wit, that no foreign corporation established or maintained in any way for the pecuniary profit of its members, shall engage in any business except that expressly authorized

by its charter or the laws of this State under which it may come. [R. S. 1909, sec. 3037, third clause.] .Plainly that clause cannot be construed to prohibit the admission of a foreign company merely because its capital stock is of a kind not provided for by our statutes; nor does the language used imply *exclusion* of a company from the State for any cause; but only the prohibition of a certain business it may wish to conduct, and which our laws do not authorize. The reason for its enactment probably was the common-law rule applied in cases cited above, that because a state does not provide for the creation of domestic corporations to do a particular sort of business, this does not imply that outside companies may not be admitted to do such business.

If what has been said is sound, no expression of a legislative intention to prohibit the admission into Missouri of foreign corporations having stock unlike the kind prescribed for home companies, can be found in our statutes, unless such an intention is expressed in the clause of Section 3343, which declares, in effect, license to do business here shall be refused to a corporation organized in another state, if it appears from its charter and articles of association that the company could not be organized under the laws of this State. Therefore our problem is to ascertain whether the Legislature intended such a consequence when it put that proviso in the statutes. And in the endeavor to ascertain the intention, we must bear in mind the disposition of the State to be liberal in its comity towards outside companies applying for admission—a disposition exhibited in the statutes themselves as expounded heretofore by this court. [State ex rel. v. Cook, 181 Mo. 596.] The principle of broad comity was applied in the last cited case in commanding the Secretary of State to issue a license to do business in Missouri, to a company (whereof two of the three incorporators were citizens of this State) formed under the laws of New Jersey to construct buildings, etc. The Secretary of State had refused a license because of the statute which prohibits the admission of a foreign corporation ''when

it shall appear that such corporation was organized un-der the law of a foreign state by citizens and residents of Missouri for the purpose of avoiding the laws of this State, as it would be a fraud upon the laws of both states, and its pretended incorporators would be held as part-ners, and as such become liable for the debts of the al-leged corporation." [Laws 1903, p. 121; R. S. 1909, sec. 3039.]

Although two of the three incorporators of the com-pany seeking admission were residents of Missouri, there was no evidence adduced that the company was formed by citizens of Missouri in order to evade its laws, ex-cept the bare fact, of the company having been formed in New Jersey. After a thorough discussion in the opinion of the subject of comity toward foreign corporations and its limits, accompanied by remarks pointing to the con-clusion that such companies are entitled to admission when they take the necessary steps to obtain a license, if their business is one not contrary to the policy of the State, the court said, at page 602:

"Looking to our statutory provisions for the pub-lic policy of the State, it will be readily observed that we have adopted a most liberal comity toward corporations organized under the laws of other states and countries. Indeed, we have placed them upon substantially the same footing as our own domestic corporate bodies and given them the same powers, and subjected them to the same ob-ligations that are provided for like corporatins in this State . . . When, therefore, such foreign corpora-tion presents itself for admission to the State, and not only shows that its articles provide powers and a busi-ness not opposed to our laws, but such as we grant to our own like domestic corporations, there is nothing in the proviso of the Act of 1903 (namely that companies shall not be formed in other states by citizens of Missouri to evade its laws) which would exclude them."

In view of the attitude of the State as thus expressed, the restrictive clause of Section 3343, that manufacturing and business companies shall not be licensed unless they

can be organized under the article of which that section is a part, should not be more rigorously enforced than is compelled by the language of the proviso when interpreted with reference to the purpose the Legislature meant to subserve by the clause, and the mischief it meant to prevent. [Pembroke v. Huston, 180 Mo. 627.]

The proviso in question makes no requirement in respect of the capital stock; but, as said above, other sections of the article where it is found demonstrate that companies organized under the article must be constituted with stock composed of par-value shares, and must have, besides, several other internal arrangements of which more will be said later. [Art. VII, Chap. 33, R. S. 1909.] We observe in this connection that a capital stock, and much less one distributed into shares of a nominal value, is not an essential feature of a business corporation. [14 C. J. p. 391, sec. 516; McGinty v. Reservoir Co., 155 Mass. 183.] And there are vareties of capital stocks unprovided for by our corporation statutes. Among them are stocks which draw interest at stated periods, instead of dividends (14 C. J. sec. 587, p. 426); and the "special stock" of corporations authorized by the laws of Massachusetts; a peculiar species limited to two-fifths of the actual capital; subject to redemption by the company, carrying a fixed half-yearly dividend, and imposing on the general stockholders liability for all the debts and contracts of the company until the special stock is redeemed. [American Tube Works v. Boston Mach. Co., 139 Mass. 5.] We think of no reason why the State should desire to exclude from its borders companies organized in other states and having those species of stock, merely because companies similarly constituted cannot be organized here. Instead, legislation has occurred in recognition of the possibility of corporations having no capital stock and organized for profit in another State, being admitted to this State, *and to the fact that they have been admitted.* In the act laying a franchise tax on corporations generally, foreign corporations without a capital stock are required to report to the taxing authorities regarding their

business, in such manner as may be prescribed, and a lump annual tax is laid upon them. [Laws 1917, pp. 238, 239, secs. 4, 5 and 6.] Our statutes make no provision for the formation of such companies, except certain classes of mutual insurance companies and possibly a few others, though the mutual insurance companies are all we call to mind. [R. S. 1909, Arts. X, XI and XII.] But Section 6 of the Franchise Tax Law includes, among foreign corporations having no capital stock upon which a franchise tax may be laid, not only mutual and other insurance companies organizable under our statutes, *but any other foreign corporation organized for profit and without a capital stock.* The language of one section prescribing the tax, makes it apply to every corporation organized as a mutual insurance corporation with no capital stock, and *any other corporation* not organized strictly for religious, charitable or educational purposes and having no capital stock. That act is cognate if not *in pari materia,* with the statutes regulating the admission of foreign companies to do business in the State and has some bearing upon the meaning of the latter statutes. [Cape Girardeau Co. Ct. v. Hill, 118 U. S. 72; 26 Ency. Law (2 Ed.), p. 624.] A manufacturing or business company having no capital stock can no more be called into existence under the article providing for those companies, than can one with a capital stock composed of non-par value shares; nor is there any reason why the one and not the other should be excluded from the State.

While there is a general similarity in the statutes of the different states of the Union, regulating the organization of corporations, there is much difference in detail; and if the clause in hand be held to mean that no foreign company can be licensed in Missouri, except those formed in states which prescribe requirements in regard to the framework of the companies identical with the requirements prescribed in our Article VII, a large proportion of business companies must be refused admission here, thereby derogating from our general policy of liberal comity. For example, companies cannot be formed under

said article by fewer than three; but in Iowa one individual may form a corporation; in Georgia any number more than one; in Mississippi, South Carolina and Washington two or more; in Nebraska any number. So under Article VII, Section 3339, there is no maximum limit to the number who may incorporate; whereas in Illinois not more than seven may do so. Our statutes require a minimum capital stock of $2000; but some states permit a lower minimum. Obviously, to say companies formed under laws unlike ours in those particulars may not come into the State, merely because they could not be created here, will amount to imputing to the Legislature the requirement of conditions for admission which tend to defeat, instead of promote, the general intention of the statutes to welcome foreign companies into the State, rather than to exclude them. But a construction of a statute which tends to frustrate its main object ought never to be adopted unless compelled by the language of the laws. [State v. Partlow, 91 N. C. l. c. 552, cited and approved in State ex inf. v. Street Ry. Co., 146 Mo. 155, 168; Missouri Granitoid Co. v. Morschel, 150 Mo. App. 650; Hawkins v. Smith, 242 Mo. 688.] Other incongruities between the laws of this State and those of other states in respect of the creation of business companies could be pointed out; but the above observations suffice to show that a literal meaning should not be adopted as expressive of the purpose of the statutory proviso, that a foreign corporation shall not be licensed in Missouri, when, if organized here it would be formed under Article VII, if it could not be organized under the laws of this State.

The impossibility of adopting a literal construction of such a statute as we are dealing with, without thereby compelling an unreasonable consequence, has been commented on by this court in a case where the Secretary of State was directed to grant a certificate of incorporation with preferred stock devoid of voting power. This decision was made in the face of our constitutional provision that ''in all elections for directors or managers of any

incorporated company, each shareholder shall have the right to cast as many votes in the aggregate as shall equal the number of shares so held by him or her in said company.'' The court said:

''If this section is to be construed literally, the Secretary's contention has much force in it. A construction has nowhere been given to Section 6 of Article 12, within our knowledge or research, so as to constitute it a prohibition or restriction on the right of stockholders to make their contracts which violate no rule of the common law and which affect no rights except their own. The reason of a law is its life. In construing it, courts look to the purpose in view.'' [State ex rel. v. Swanger, 190 Mo. 561, 575.]

We remark, as pertinent to our problem, that the specifications in Article VII of the details to be observed in organizing a manufacturing or business company, have been amended in important particulars and are continually changed by the Legislature. If a narrow interpretation is given to Section 3343, it will result that foreign companies which might have been domesticated here in 1909, cannot be now. The change made in 1911, by which the requirement of Section 3339, that the whole amount of capital stock must be subscribed and not less than half of it paid up in lawful money, was modified to require only half of the stock to be subscribed, but that part fully paid, is an example of the amendments. [Laws 1911, p. 148.] Another is the change in Section 3347 as to the maximum number of directors. Is it to be supposed that these modifications of the law, and others like them, occurring from time to time, must exclude from the State a foreign company having different arrangements, either by refusal of a license to such a company in the first place, or, if it was already licensed, depriving it of state privileges?

Worthy of notice in connection with our inquiry are the various provisos contained in Section 3039 and Section 3343 and elesewhere about the licensing of outside companies, namely, that no company shall be licensed if it

would violate the anti-trust law of the State, or if its name is the same as that of a similar domestic company, or if organized by citizens of this State to avoid its laws, the length of the period it may operate in the State, etc. These provisions suggest that the facts which justify the refusal of license to outside companies have been definitely stated in our statutes, thereby excluding refusal for other reasons.

The verbal meaning of said clause having been rejected, no other conclusion can be drawn, we think, than that it operates to prevent, firstly, the admission of outside companies which are organized in respect to some feature of their internal economy unlike the arrangement provided by our laws for domestic companies *and violative in that regard of our public policy,* and, secondly, those organized to engage in a business opposed to our policy.

To keep foreign companies within the limits of the policy of the State, the Legislature, prior to the enactment of the clause in question, had enacted that no foreign corporation established and maintained in the State for the pecuniary profit of its members, should engage in any business other than that expressly authorized by its charter, or the laws of this State. [R. S. 1909, sec. 3037.] It may be thought that said proviso sufficed to keep out of the State foreign companies formed to conduct a business which no company could be formed to conduct in this State; and that hence the later enactment, with which we are concerned, must have been intended to have a wider effect than to exclude outside companies solely because their business was one for which a domestic company could not be created. We give it a wider effect, and embrace within its restriction a corporation not organizable under Article VII, either because of the nature of its *business* or its *framework,* if either *violates the public policy of this State.* The real question is, does the relator company contravene our policy in either regard?

Moreover, the language of the clause quoted from Section 3037, is ambiguous and susceptible of more than

one interpretation.  It does not say an outside company cannot engage in any business in Missouri that a domestic corporation is not expressly authorized to engage in, but that the outside company may not engage in any business *not authorized by the laws of the State.*  The probable meaning is that a foreign company, although permitted by its charter to engage in a certain business, when it comes into Missouri, may have its right to carry on the business restricted by the laws of Missouri; and that it will be thus restricted if its business is one our law does not authorize.  The clause in Section 3343 is more definite in its restraint, and undoubtedly prevents the admission of a foreign company to engage in any enterprise which a domestic company could not be organized to conduct.  It is a more emphatic and certain restriction laid on *manufacturing and business companies,* than was laid by the earlier proviso *on any kind of corporation organized for the profit of its members;* and we repeat should be held to go further than merely preventing the licensing of companies created for a purpose for which we do not incorporate companies, and to forbid the admission of a company whose constitution differs from the framework of our domestic manufacturing and business companies in some matter of such importance as, presumably, to be within the mischief meant to be prevented by the section (3343).  Whether in the latter regard the variation in the framework of an outside company falls within the operation of said section, we think depends on whether it conflicts, to a serious degree, with our general policy regarding corporations.  In other language, whether the different internal features of the company would give it an advantage over home companies, or introduce some other evil.  This view of the matter accords with the tenor of the decisions on the question of how far the rule of comity among the state is extended in admitting into one state corporations organized elsewhere.  The effect of the decisions on the subject is thus stated in a treatise of merit, 8 Fletcher, Ency. Corp. sec. 5736, p. 9376: ''It is now thoroughly well settled by the overwhelming

weight of authority that by the law of comity among
nations, which prevails also as between the states, a cor-
poration created by the laws of one state or country is
permitted to do business and make contracts in another
state or country, and to sue in its courts, unless there
is some express statutory prohibition, or unless the rec-
ognition of the corporation by such other state or coun-
try is contrary to its public policy, as established by the
general course of its legislation or the adjudications of
its courts. This law of comity is not a vague idea only,
which the courts may regard or disregard as they may
see fit. They are as much bound to give it effect as they
are to give effect to any other rule of the common law.''
[Citing Dayton Co. v. Barton, 183 U. S. 23; American
Union v. Yount, 101 U. S. 356; Lukens·v. Internat. Ins.
Co., 269 Mo. 574; State v. Roach, 267 Mo. 300; Daggs
v. Ins. Co., 136 Mo. 382.]

Having determined that although the proviso of Sec-
tion 3343 with which we are dealing, does not amount to
an absolute prohibition against licensing corporations of
another state, merely because they possess some charac-
teristics they would not have if formed here, yet that,
nevertheless, they may have details of framework so
opposed to our policy as to exclude them from the state,
we come to the inquiry whether relator's stock of non-
par value is of that character.

The sources of evidence of what the policy of this
State as to foreign companies is, are these: the enacted
laws of the State, the decisions of its courts of review,
the practice of the executive department of the govern-
ment and, presumably, the purpose to preserve *bonos
mores* by keeping out everything tending toward fraud.
[8 Fletcher, Ibid, quoting Clark v. St. Ry. Co., 123 Tenn.
232. See also St. Louis Min. & Mil. Co. v. Montana Min.
Co., 171 U. S. 655, and other cases cited in note 56, p.
9402.] Testing by those standards the *status* of relator's
par-value stock in the light of our policy, we perceive at
once there is nothing inherently fraudulent or *contra bon-
os mores* in that species of stock or in corporations or-

ganized with it; and we have seen that our statutes contain no express prohibition of the admission of such a corporation. Neither has there been any decision by this court or either of the courts of appeals supporting the proposition that it is against the State's policy for such corporations to be admitted. As far as we are advised regarding the practice of the executive department of the State Government, it has been to admit foreign companies organized with other kinds of capital stock than are provided for in our laws for the formation of business companies; and this is a pertinent fact to be considered and weighed. [Ross v. Railroad, 111 Mo. 18; Pugh v. Railroad, 118 Mo. 506.]

We will notice next the ways in which it is contended that a corporation with stock like relator's would infringe the policy of the State. Of these the first and most important is that our laws make the stockholders of a corporation liable to its creditors, if it becomes insolvent, for any balance remaining unpaid on the par value of their shares; and that if a corporation having shares of no par value is admitted, creditors cannot, in case of the insolvency of the company, look to this liability for the collection of their claims; and further that in this regard such a foreign company would not be subject to all the liabilities, restrictions and duties which may be imposed on a corporation of a like character organized under the laws of this state, as provided in Section 3037, Revised Statutes 1909. It is to be premised that the shareholders will be liable to the company's creditors in the event of its insolvency, for any difference between such fixed value of their shares and the amount they have paid on them, just as they would be if the shares had a par value. [5 Fletcher, sec. 3455; Laws Delaware, 1917, pp. 326, 327.] Section 20 of the Act of Delaware bearing on this matter is set forth above and makes the holders of shares with no nominal value, liable to the company's creditors for " *the unpaid balance of the consideration for which such stock was issued by the corporation, which said sum or proportion thereof may be recovered as provided,*" etc.

The petition of relator states the actual value of the assets behind the non-par value shares, to-wit, more than three million dollars; and in every case a person dealing with such a company could ascertain the amount of the actual assets before giving credit, as readily as if the stock had a nominal value; for the value of the assets, not the par value of the stock, is the essential fact.

What is the purpose of our law in regard to the liability of shareholders of an insolvent corporation to its creditors? Is it the policy to require, absolutely, for the benefit of creditors, that all shares shall have a nominal or par value; or is it not rather the purpose to prevent stockholders from evading full payment for their stock, thereby creating a fictitious capitalization which may induce persons dealing with the company to extend credit to it on the faith of a capital stock which has been fully paid and is represented by assets, when in fact the capital stock does not have behind it, assets to its full nominal value? Otherwise stated, is it not the purpose of our laws to compel subscribers who have agreed to contribute so much to the capital stock of the company, to make good their agreement, either to the company itself, or to its creditors if it becomes insolvent? We think this is the true policy and purpose of our laws, and that though domestic companies must issue only par value shares, this requirement is not exacted for the benefit of creditors. The law is satisfied if shareholders are made to answer to creditors in the sum they agreed to pay, thereby protecting the public against deception by an unpaid capital stock.

The only other particular in which it is urged the the non-par-value stock of relator is contrary to the public policy of this State, is that the company, if admitted to do business here, could not be taxed in the manner provided by our laws. It is true the statutes require foreign companies to pay the same fees and taxes as those paid by domestic corporations, and the amount of the tax to which they are liable is made to depend upon the proportion of the capital stock represented by their

business in Missouri to the whole amount of their capital stock. [R. S. 1909, sec. 3039.] That law, like others we have cited, was adopted with the thought in mind that companies for gain have capital stocks of an amount named in their charters, but not with the purpose of shutting them out of the State if no certain amount of stock was prescribed. Neither is the conclusion to be deduced that companies having stock of no par value fixed by charter, cannot be assessed and made to pay a just tax to this State if they are admitted here. In dealing with this very objection to the admission into Kansas of a corporation like the relator, the Supreme Court of that State held the objection untenable. The decision was given upon a statute for the taxation of foreign corporations which, like ours, based the tax upon the proportion of a company's capital stock employed in the State of Kansas, as will be seen in reading the opinion. [N. A. Petroleum Co. v. Hopkins, 181 Pac. 625.] The court said, at page 627:

"The problem of determining the solvency and bona-fide capitalization of the plaintiff presents no unusual difficulty. The fact that the shares of its stock have no nominal par value is of little consequence. Any prudent charter board, in determining whether a foreign corporation is worthy of admission to do business in Kansas, would attach little importance to the nominal value of its shares of stock, even if they have a nominal value. As in all other cases, the charter board should concern itself earnestly to ascertain the genuine capital—those assets permanently devoted to the corporate business as a basis for its business credit, and upon which its hope of profits is rationally founded.

"The 'lawfully issued capital' and the 'capital stock' of such corporations are the assets that it devotes to the prosecution of its business. When the value of those assets is ascertained, the fee, required to be paid by law, can be based on that portion of the assets which the corporation proposes to 'invest and use in the exercise and

282 Mo.—19

enjoyment of its corporate privileges within this State.' "

We think the view of the matter taken by the Supreme Court of Kansas is sound, and that the tax officials of this State will have no unusual difficulty in determining what taxes ought to be paid by relator and similar corporations if licensed to come into the State.

It is proper to direct attention to other pertinent remarks in the opinion in the Kansas case, made in answer to the contention of the defendants, that the corporation seeking admission, notwithstanding its stock was without par value, was not such a corporate body as was recognized by the constitution and laws of Kansas. The court said, and said truly, that corporations without capital stock or shares of stock, were not new, but had existed in England and this country for many years. It has been stated in treatises and judicial opinions that business corporations with share-stock are of comparatively recent date (14 C. J. sec. 516; McKim v. Odom, 3 Bland's Chancery, (Md.) 407); although most corporations for gain now have that feature. But in view of the fact that companies organized differently are of ancient as well as contemporary date, it seems improbable that the Legislature intended to extend comity only to companies of the newer variety.

The Attorney-General in a fair and able brief points to the proviso in Section 3343, that "foreign corporations otherwise qualified to engage in business in this State, but whose authorized capital stock exceeds ten million dollars, may obtain such license if the proportion of the capital stock of such corporation employed in this State, shall not exceed the capital stock domestic corporations are permited to have." This proviso, it is argued, demonstrates that the part of said section which says a foreign corporation shall not be granted a license if it could not organize under Article VII, relates to something more than the business or purpose for which the corporation was formed, as otherwise the proviso in relation to the amount of capital stock would be without force. We concede this argument has weight. The particular proviso

limiting the amount of the capital stock of a foreign corporation which may be employed in this State, was inserted, we think, for the special purpose of preventing outside companies from using more capital than domestic companies may use, thereby putting the latter at a disadvantage in the competition for and transaction of business. In our judgment it does not indicate an intention to admit no foreign company different in any way in the form and nature of its stock from domestic corporations. It can be readily understood that if outside companies are permitted to use a larger capital in Missouri than domestic corporations can, the latter will be prejudiced; but it is not perceived that the same result would follow because the outside company may issue shares without a nominal value. We look upon the proviso stressed by the learned Attorney-General as a precautionary measure inserted in the section to make certain beyond peradventure that foreign companies may not employ a larger capital in Missouri than home companies can employ. [25 R. C. L. 987.]

All the statutory provisions which can be conceived to touch the question under consideration should be construed, if possible, in subordination to the dominant purpose of our laws to admit to the State and not exclude from it, foreign companies; and keeping this purpose in sight, in our judgment it may be held without doing violence to the language or intention of the various relevant statutes, that relator is entitled to a license.

The demurerr to the alternative writ of mandamus to respondent is overruled, and a peremptory writ granted, commanding him to issue a license to the relator.

All concur, except *Walker, C. J.,* who dissents; *Woodson, J.,* absent.